585 A.2d 471

**COMMONWEALTH of Pennsylvania**

v.

**David Joseph MUNCHINSKI, Appellant.**

Superior Court of Pennsylvania.

Argued June 19, 1990.

Filed Nov. 30, 1990.

Reargument Denied Feb. 11, 1991.

302

304

John S. Cupp, Jr. Connellsville, for appellant.

Before CIRILLO, President Judge, and OLSZEWSKI and TAMILIA, JJ.

TAMILIA, Judge:

Appellant's counsel, in flagrant violation of the rules of appellate procedure in briefing this case, has inundated this Court with an appellate brief of 203 pages including 28 statements of questions involved covering 6 pages, as well as a supplemental brief of 16 pages with 40 pages of appendices, and a reply brief of 37 pages with 17 pages of appendices. The statement of issues involved is so convoluted and serpentine in expression and logic, as to provide extreme difficulty for this Court to extrapolate the essence of the arguments from irrelevant and inappropriate argument.

Pa.R.A.P. 2101 requires conformance with the requirements of the Rules of Appellate Procedure, and if noncompliance is substantial, the appeal may be quashed or dismissed. Pa.R.A.P. 2116 specifies the statement of questions involved should not ordinarily exceed 15 lines and must never exceed one page (here, there were 28 statements covering five pages). The statement of the case required by Pa.R.A.P. 2117 was not directed to the procedural aspects of the case but contained mostly arguments concerning the errors of the trial court and the alleged inability of appellant to obtain information he desired. Further, appellant failed to comply with subsection (c) of Rule 2117 in designating where in the record the issue was

preserved and the method of raising the question. Rule 2135, Length of Briefs, limited appellant's brief to 50 pages, which appellant has violated by a factor of 4, submitting a brief of 203 pages. Appellant acknowledges the flagrant violation of the rules and seeks to hide from its consequences by alleging in statement of question XXVIII[1] the unconstitutionality of the Rules of Appellate Procedure in limiting the brief to 50 pages, thereby limiting appellant's ability to present full and complete arguments. Dealing with this issue instantly, appellant points to no authority or constitutional support which denies the Supreme Court, with its constitutionally mandated powers, the right to regulate the procedures for taking appeals. *Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382 (1985). The cases are legion which interpret that authority and render appellant's argument ludicrous and totally without merit. The Pennsylvania Constitution gives our Supreme Court exclusive power to establish rules for the state courts. *In re 42 PA. C.S. § 1703*, 482 Pa. 522, 528, 394 A.2d 444, 448 (1978). We, as an intermediate appellate court, can neither change nor ignore such rules. The remedy in this instance is to quash the appeal for failure to comply with the rules of appellate procedure. The consequence, however, would be to delay final determination of any legitimate issues present, at great expense to the taxpayers, as the case would return to this Court because of ineffectiveness of appellate counsel. Having been notified of his dereliction, it would not be remiss for this Court to direct the Disciplinary Board of the Supreme Court to review counsel's conduct, particularly if the behavior is repeated.

In order to expedite this appeal, we will consolidate the statements of questions presented, as many are duplicative and redundant, and deal with them in categories whereby

1. "XXVIII. Did this honorable court unfairly limit the appellant to fifty pages of argument and thereby limit appellants [sic] ability to present full and complete arguments as required by the rules of appellate procedure in violation of the first, fifth and fourteenth amendments of the United States Constitution and the applicable portions of the Pennsylvania Constitution?" (Brief of appellant at p. 8.)

their relationship to each other can be discussed in some coherent and logical fashion. Initially, a short factual and procedural history of the case is helpful to assist us in focusing on the underlying issues. For this purpose, the history provided by the trial judge in his Opinion appears to offer the clearest and most cogent analysis. Appellant's statement is of reduced value as it confuses argument with factual history.

On the night of December 1, 1977, the defendant, [David Joseph] Munchinski, met with Leon E. Scaglione, (hereafter called "Scaglione"), and Richard A. Bowen, (hereafter called "Bowen"), at "Harry's Bar" in Greensburg. Bowen was introduced to the defendant by Scaglione, who he had known for several years. Scaglione and the defendant told Bowen that they were going to Bear Rocks "to rip-off some drugs" and wanted Bowen to drive the car. (N.T. 179). Bowen agreed, and drove Scaglione and Munchinski to a cabin in Bear Rocks. Scaglione told Bowen to stop the car. Both Scaglione and the defendant exited the car and disappeared in the direction of the cabin. While sitting in the car, Bowen heard the sound of nails being pulled. After a few minutes, Scaglione returned to the car and asked Bowen to come into the cabin, telling him "that I would like this, or I would dig this." (T. 181).

After entering the cabin, Bowen saw Munchinski "with a gun in his hand holding two fellows at gun point." (N.T. 181). Scaglione then demanded that the two men give them the drugs. They responded that they didn't have any. Scaglione then forced one of the men to take his pants off, and Scaglione sodomized him, (N.T. 182–183), after which Munchinski "did the same thing to the other fellow he had the gun on." (N.T. 183).

Afterwards, Munchinski and the man on whom he was holding the gun went into another room and "returned with a little jewelry box which was full of little bags of white powder." (*Id.*) Scaglione became very excited at that point and then shot repeatedly the man he was holding at gun point (N.T. 184). Bowen moved for the

door whereupon Munchinski turned his gun on him. Scaglione told him to "knock it off" and the defendant then turned around and began firing at the other man. (*Id.*) Bowen then ran to the car and sat in the driver's seat, hearing several more shots being fired. Scaglione and the defendant then came running from the cabin yelling "get out of here." Bowen then drove the two back to Greensburg to the "William Penn Club."

The next day Bowen left for Oklahoma where he remained until the following March when he was extradited on other charges.

During the early hours of December 2, 1977, Bonnie Blackson and her husband were awakened by noises on the porch of their home at 866 Rockpool Road, Bear Rocks, which sits approximately fifty yards to the rear of the cabin where the killings took place. Upon investigation, they found a man sitting on their porch, slumping slightly, making no visible signs of movement. They called EMT's from Mount Pleasant who examined the man, finding him dead. The body was later identified as that of Peter Alford.

The Pennsylvania State Police were notified, and Trooper Richard W. Powell arrived, along with Corporal Richard Cecconello. They investigated around the Blackson home and found a trail of blood that led to the cabin in the rear. They entered the cabin and searched it, finding a partially nude male body lying in the living room in a pool of blood, and exhibiting several gunshot wounds. (N.T. 28). The body was later identified as that of Raymond Gierke.

On January 28, 1978, Debra Sue Dahlmann and Lori Jane Lexa, friends of the two murder victims, entered the "Five Points Bar" in Greensburg. After they walked into the bar, the defendant called Dahlmann to his table. He was seated with Scaglione and another man whose name she did not know. The defendant asked who Dahlmann had with her. She told him that her friend was Lori Lexa, to which the defendant asked, "Petie Alford's girl

friend?" She said "yes." He then told them to sit down but they refused, and the defendant then pulled a knife and told them to sit down. (N.T. 159). They did. The defendant then told them to "speak the truth, say 'sala'," and he said "Petie Alford had said 'sala' before he died." (N.T. 159). The women asked Munchinski if he had seen Petie Alford at Bear Rocks before he died, and Munchinski said "yes." They also asked if he saw Gierke that night too, to which he responded that he had and that he had shot Gierke. (N.T. 158).

Scaglione became angry at this point, grabbing a beer bottle, hitting it on the table, and saying, "no, I am the one that shot Gierke. I stuck the gun up his nose and pulled the trigger." (N.T. at 158–159 and 169–170). The girls left soon after.

Earlier that night Bernard [F]urr had a conversation with the defendant in the "Five Points Bar." Furr had been there with a friend when he saw the defendant enter with Scaglione and a third man. Furr left the bar to take his friend home and then returned. When he re-entered the bar, Furr saw the defendant talking to a friend of Furr. The defendant then called Furr over to his table. Furr did not know who he was at the time, but went over to inquire what the defendant wanted. "I hear you've been looking for me," the defendant told Furr. Furr told him that he did not know what he was talking about, and the defendant then said, "I am the one that killed your friend, Mr. Alford." The defendant then proceeded to tell Furr of the killings and that they were killed because they owed fifty thousand dollars for drugs they had received. (N.T. 270). Furr had put the word on the street that he was looking for Alford's and Gierke's killers and was going to make them pay. (N.T. 277).

While Munchinski was serving time in the Fayette County Jail on these charges, he came in contact with Harold E. Thomas who was serving time on the charge of receiving stolen property. Munchinski told Harold Thomas that he, Scaglione, and Bowen went to Bear Rocks for

the purpose of obtaining drugs, that while in Gierke's house they found the drugs were there but not as much as they expected, and they knew there were more drugs in the house. Munchinski stated that Scaglione shot one guy and that he shot the other one as he was going out the back door. He also told Thomas that the driver of the car who took them to Bear Rocks was Richard Bowen. (T. 263–264).

(Slip Op., Adams, J., 6/30/87, pp. 6–10.)

On October 22, 1982 a complaint was filed against David Joseph Munchinski at number 755 of 1982, and fractions thereof, charging Munchinski, inter alia, with two counts of criminal homicide and criminal conspiracy with regard to the deaths of James Peter Alford and Raymond P. Gierke, which occurred on December 2, 1977.

Leon E. Scaglione, a co-defendant, ... was charged, inter alia, with two counts of criminal homicide and criminal conspiracy at number 792 of 1982, and fractions thereof, with regard to the deaths of James Peter Alford and Raymond P. Gierke, which occurred, as stated, on December 2, 1977.

The charges against Munchinski and Scaglione were consolidated for jury trial.

The case was called for trial on April 6, 1983. On April 12, 1983, by reason of the jury being unable to reach a verdict, the Court declared a mistrial.

Munchinski filed an appeal to the Superior Court alleging that the Court erred in refusing, inter alia, the motions of the defendant to quash the informations. The Superior Court refused the motion to quash, and remanded the case for trial.

The petition for allocatur was denied by the Pennsylvania Supreme Court.

This Court, upon petition by Munchinski and without objection by Scaglione, severed the cases.

The case of Scaglione was called for trial on August 4, 1986. At this time the Commonwealth agreed to dismiss the charge of conspiracy to commit criminal homicide.

The Court, in a bench trial, found Scaglione guilty of murder in the first degree on two counts.

Munchinski's case was called for trial on November 17, 1986 before a jury. The Commonwealth agreed to dismiss the charge of conspiracy to commit criminal homicide and to proceed only on the homicide charges.

Following the conviction by the jury of murder in the first degree of James P. Alford at number 755 of 1982, murder in the second degree of James P. Alford at number 755 of 1982, murder in the first degree of Raymond P. Gierke at number 755⅓ of 1982, and murder of the second degree of Raymond P. Gierke at number 755⅓ of 1982, the defendant timely filed his motions for new trial and arrest of judgment[.]

(Slip Op. at 1–3.)

While normally we deal with statements of questions in a seriatim fashion, this is not possible in this case because of the large number of questions presented and the mixing throughout of issues which should be considered together, in that they are overlapping and redundant.

## SECTION I

### Double Jeopardy

Those questions, as stated in appellant's brief, are:

I. Was the second trial of the appellant held in violation of the rule against double jeopardy because of prosecutorial or judicial misconduct which occurred at the first trial, in that:

A. Prosecutorial misconduct based on the false representation by the attorney for the Commonwealth that two defense witnesses were in a federal witness protection program when he knew they were not.

B. Prosecutorial or judicial misconduct when the defendant was tried on four conspiracy charges that were knowingly and deliberately pressed beyond the statute of limitations, and of which no notice was afforded defendant prior to trial.

C. Is the appellant unfairly prejudiced from arguing this issue fully because the court has failed to make records available to him? [2]

II. Did the honorable trial court commit reversible error by refusing the request of the appellant for defense witness (use) immunity for defense witness, Leon E. Scaglione, after the district attorney of Fayette County, Pennsylvania, initially refused this request?

III. Did the district attorney of Fayette County, Pennsylvania commit prosecutorial misconduct in refusing to grant defense witness, Leon E. Scaglione, immunity for testimony to be offered on behalf of the appellant, David J. Munchinski, at his request?

IV. Whether the honorable trial court committed reversible error when it refused the request of the defendant to offer into evidence and have read to the jury, the pertinent portions of the trial transcript of the nonjury trial of said defense witness, Leon E. Scaglione, wherein he gave testimony which completely exculpated the appellant, David J. Munchinski?

V. Did the honorable trial court commit reversible error when it denied defendant's pretrial motion for interlocutory appeal on the questions of defense witness immunity and use of the trial transcripts of Leon Scaglione?

VI. The appellant, David J. Munchinski, challenges the constitutionality of Pennsylvania Rule of Judicial Procedure 42 Pa. C.S.A., Section 5947 *Immunity of Witnesses,* in that the rule prohibits the trial court from granting statutory defense witness immunity without the consent of the attorney general of Pennsylvania or a district attorney. This statute is in direct violation of the defendant's rights to a fair and impartial trial and his due process rights as is guaranteed by the United States

2. This Court recently considered another appeal by appellant in which we determined he was not entitled to additional copies of the court records and transcripts underlying the current appeal due to alleged difficulty in sharing the one court-provided copy with counsel. *Commonwealth v. Munchinski,* —— Pa.Super. ——, 581 A.2d 975 (1990) unpublished memorandum.

Constitution and the Constitution of the Commonwealth of Pennsylvania.

VII. Did the honorable trial court commit reversible error when it failed to instruct defense witness, Leon E. Scaglione, that he no longer had fifth amendment protection against self-incrimination having already been convicted of the crime for which he would testify?

XXI. Should the convictions obtained against appellant be reversed and the sentences vacated, because said convictions were obtained in violation of the United States constitutional protection against double jeopardy, and applicable provisions of the Pennsylvania Constitution, due to the fact that in the instant record it is certain that appellant was tried upon two counts of criminal homicide and convicted of both first and second degree murder for each separate count; therefore, for each count charged, appellant was convicted of two crimes (a total of four crimes) arising from the alleged act; and was former defense counsel, Charles C. Gentile, ineffective for not properly objecting to, or adequately preserving this issue?

The eight issues listed above can properly be reduced to the following. The second trial resulted in reversible error because of prosecutorial and judicial misconduct *during the second trial* in failing to permit the co-defendant, Leon E. Scaglione, to testify on behalf of appellant, or permit Scaglione's testimony from his own non-jury trial to be admitted as evidence to exculpate appellant. It also violated the rule against double jeopardy because of prosecutorial and judicial misconduct due to allegations by the prosecutor that two witnesses were in a federal witness protection program and judicial action which knowingly permitting the appellant to be tried on four conspiracy charges beyond the statute of limitations. Appellant also alleges the court failed to make records available to him.

■ The issues presented here in regard to double jeopardy were presented for the first time before this Court in an earlier appeal. Since those issues were neither part of the

314

argument before the trial court nor presented in post-trial motions, they are waived.

■ In the May 31, 1985 memorandum by this Court, *Commonwealth v. Munchinski*, 345 Pa.Super. 620, 496 A.2d 853 (1985), we disposed of issues raised by appellant concerning double jeopardy, although not the same issues raised here. It is arguable that in raising that issue, but in not dealing with all the possible defenses available at that time to a retrial on double jeopardy grounds, appellant has waived them. The same rule applied in appellant's earlier appeal was found in *Commonwealth v. Clark*, 287 Pa.Super. 380, 430 A.2d 655 (1981), which established that the test of whether judicial and prosecutorial conduct results in double jeopardy mandating retrial depends upon a finding of bad faith overreaching rather than mere prosecutorial error. None of the provisions stated in *Clark*, which could result in a bad faith finding, are present instantly. At best, appellant can point only to the hand-written notations on the Orders for both witnesses Cannon and Bevilacqua by Judge Franks that the witnesses were unavailable as the district attorney had learned they were in a witness protection program. While it is alleged these witnesses would be able to testify that Richard Bowen had a deal with the prosecutor to testify adversely to appellant, this is not sufficient to infer that the prosecutor would conspire to avoid their presence by lying to the court. In view of the fact Bowen was to testify and in fact did so, the same information could have been obtained from him on cross-examination in testing his credibility. The testimony of Cannon and Bevilacqua, if admissible, at best would have been cumulative. Appellant has no proof of deliberate overreaching and bad faith other than his suspicions. We find this issue to be without merit. No transcript of discussions on this issue has been discovered and the mere allegations of counsel cannot be a basis for a double jeopardy finding.

■ The next part of the questions raised by appellant has to do with judicial misconduct by the trial court in

permitting conspiracy charges to be processed beyond the running of the statute of limitations for conspiracy.

˴ The Commonwealth denies these claims of error. The record shows that at the second trial, the two conspiracy to commit murder charges were withdrawn by the Commonwealth. In the absence of prejudice to appellant, since the first trial in which the charges were brought ended in a mistrial and upon appeal the same issue was raised in appellant's double jeopardy claim and denied by this Court, the most that can be said was an error was committed, which subsequently was rectified at the second trial. Appellant has no basis upon which to raise that issue again at this time.

 As to the issue raised concerning prosecutorial and judicial misconduct in failing to grant Scaglione immunity to testify on appellant's behalf, or to admit Scaglione's testimony from his bench trial to exculpate appellant, the trial court, in excellent fashion, dealt with these issues. The pertinent provision of Title 42, Judiciary and Judicial Procedure, 42 Pa.C.S. § 5947, Immunity of witnesses, prohibits the trial court from granting defense immunity without consent of the Attorney General of Pennsylvania or a district attorney. *Commonwealth v. Johnson*, 507 Pa. 27, 487 A.2d 1320 (1985); *Commonwealth v. Bernstein*, 357 Pa.Super. 13, 515 A.2d 54 (1986). The Attorney General was not contacted and the district attorney refused to grant immunity. The court, therefore, was correct in denying immunity. The district attorney refused to grant immunity because Scaglione had direct appeals and collateral appeals available to him and, therefore, any grant of immunity would prejudice the Commonwealth's case against him. *Johnson* is properly distinguished from *Virgin Islands v. Smith*, 615 F.2d 964 (3d Cir.1980), by the trial court as the conditions applicable to *Smith* are not present here. Also, *Johnson* never held *Smith* is binding on Pennsylvania Courts. As in *Johnson*, there appears to be no deliberate attempt by the Commonwealth to disregard the factfinding process. The Commonwealth has a strong countervailing

316

interest in the successful conclusion of Scaglione's case on appeal, since he is a convicted co-defendant in appellant's case. Thus, the appellant's argument on the above issue is void of merit.

The trial court properly refused to admit the trial testimony of Scaglione into evidence during appellant's trial. While such testimony is technically admissible under the unavailable witness rule, the unusual posture of this case was such that the Commonwealth never had an opportunity to cross-examine Scaglione at his trial and, therefore, the transcript does not meet the test of the statute. 42 Pa.C.S. § 5917; *Commonwealth v. Taylor*, 299 Pa.Super. 113, 121, 445 A.2d 174, 178 (1982). Scaglione's case was severed from appellant's at appellant's request. Scaglione only presented an insanity defense and it was this issue alone on which the Commonwealth had the opportunity to cross-examine. Scaglione, in a partial plea, admitted his role in the murders, exculpated appellant and implicated another person who has not been investigated or charged. His testimony at best must be viewed with extreme suspicion and caution, in view of the other overwhelming evidence of appellant's guilt.

Finally, appellant's contest to the constitutionality of the Immunity Statute is deemed waived, as we are aware of no notice given to the Attorney General which is required by Pa.R.C.P. 235, wherein the Attorney General is named as a necessary party and the constitutionality of his power is contested. We must presume the constitutionality of a statute, and unless the statute is blatantly unconstitutional on its face, we must defer to the Supreme Court to determine constitutionality. *Hughes v. Com., Dept. of Transp.*, 514 Pa. 300, 523 A.2d 747 (1987).

As to whether appellant could be convicted of first and second degree murder, his argument turns on whether the same act can support two charges. The right of the Commonwealth to charge both first and second degree murder depends upon whether the elements of both crimes

exist. *Commonwealth v. Bidner*, 282 Pa.Super. 100, 422 A.2d 847 (1980). First degree murder is chargeable when a premeditated killing with malice is established. *Commonwealth v. Young*, 524 Pa. 373, 572 A.2d 1217 (1990). Second degree murder is chargeable when a homicide is committed in the course of certain enumerated felonies. 18 Pa.C.S. § 2502(b). While conspiracy charges were dismissed as the statute of limitations had run on the underlying charges, the commission of those acts, once the killing occurs, remains as a constituent part of the felony murder. Second degree murder has no statute of limitations and, therefore, was properly chargeable. The court could properly instruct the jury on both degrees of murder as elements supporting both existed and it is common practice to charge on all degrees of murder which might be supported by the acts upon which the charges are based. *See generally*, Pa. Suggested Standard Jury Instructions (Criminal) § 15.2501B. The jury may find guilt on all or none of the charges. It is then up to the court at sentencing to make a distinction or to merge the sentences to avoid excessive or conflicting sentences. *Commonwealth v. Wienckowski*, 371 Pa.Super. 153, 537 A.2d 866 (1988). This is precisely what the court did in sentencing appellant to a term of life in each first degree murder, one consecutive to the other, and setting no penalty for the two second degree murder charges. Appellant's argument is specious in alleging only two charges should have been filed when in fact two parties participated in the murders, robberies and sodomy, each being chargeable with the acts of the others, not as conspirators but as co-actors who share equal responsibility for their criminal acts. *See* 18 Pa.C.S. § 306; *Commonwealth v. Bradley*, 481 Pa. 223, 392 A.2d 688 (1978). We therefore find this claim without merit.

## SECTION II

### Admission of testimony and evidence

VIII. Whether the honorable trial court committed reversible error when it refused to permit defense witness-

es, William Cole and Jon Chump to testify relative to a meeting that took place between themselves, the victims, and the defendant within the week prior to the date of the homicides?

IX. Did the honorable trial court commit reversible error when it refused to permit counsel for the appellant to question Commonwealth witnesses Debra Dahlmann and Lori Lexa concerning one Homer Stewart?

X. Did the honorable trial court commit reversible error when it refused to admit evidence which corroborated the testimony of Leon E. Scaglione given at his non-jury trial:

A.) Photographs of the defendant and one Homer Stewart, the person named by the said Leon E. Scaglione, as the one who assisted him in the planning and commission of this crime.

B.) The testimony of proposed defense witness, Diane Battistella, who would have testified that the said Homer Stewart, eight (8) months prior to the commission of the crime, threatened one of the victims.

C.) The testimony of other defense witnesses and the defendant which would have established that the said Homer Stewart had a motive to kill the victims and of the similarity of appearance between himself and the appellant, David J. Munchinski?

XI. Whether the honorable trial court committed reversible error when it over-ruled defendant's objection as to the relevance of the testimony of Trooper Robert Taylor, called as a rebuttal witness by the Commonwealth?

XII. Did the honorable trial court commit reversible error when it refused the request of the defendant to strike the testimony of the Commonwealth witness, Richard A. Bowen, after said Richard A. Bowen gave perjured testimony on behalf of the Commonwealth during the trial of this case?

Question VIII concerns an alleged conversation between Cole and the victims in a meeting arranged by appellant through Chump in which Cole informed the victims Homer Stewart offered him money and drugs to rip off

Gierke and another man because they owed Stewart money. This was disallowed by the court as hearsay which fell within none of the exceptions to the rule against hearsay and was an attempt to corroborate Scaglione's inadmissible testimony that Stewart was his accomplice. This alleged conversation occurred a week before the killings but would be used to rebut the eyewitness testimony of Bowen and the testimony of witnesses Dahlmann and Lexa of admissions by appellant and Scaglione made after the killings of their involvement. At best, the testimony would be immaterial as to the later admissions and inadmissible to support evidence which itself was inadmissible. As such, the trial court ruled correctly.

For the same reason, issue IX is without merit. Homer Stewart was never properly established as a possible suspect and to permit the jury to hear cross-examination concerning a person never identified during the trial or placed in issue as a possible suspect, would be to introduce an irrelevant consideration and simply serve to confuse the jury. The trial court properly ruled on this issue. Issue X is resolved in the same fashion as above in that photos of Stewart and witnesses to corroborate Scaglione's inadmissible statements were themselves inadmissible. Issue XI alleges the court erred in overruling defendant's objection to the relevance of the testimony of Trooper Taylor, who was called as a rebuttal witness by the Commonwealth. The court held the objection was waived because it was not on the record. Appellant contests the waiver and would have us find the issue preserved. He argues admission was improper as appellant had attempted to establish an alibi defense as to his whereabouts the night of the homicide, whereas Taylor's testimony would establish his presence in the company of appellant the night before the killing. The record indicates that, at the prior trial, appellant stated he was caring for his sick dog from November 30th through December 3, 1977, and had not left his dwelling (T.T., p. 375). Trooper Taylor's testimony was used in rebuttal to establish that on December 1, 1977, 1:30 to 2:30 a.m., he

saw appellant at a residence at Hitchdale, Pennsylvania, at least five miles from appellant's dwelling (T.T. at 377). The admission of this rebuttal testimony, while not relevant as to the whereabouts of appellant at the time of the killings on December 2nd, was relevant to the *total* alibi proffered by appellant that he did not leave his dwelling prior and up to the time of the killings. Since the rebuttal was directed to the truth of the alibi testimony in toto, it was proper to admit it.

As to the alleged error committed by the trial court as to the admissibility of Bowen's testimony (Issue XII), appellant has incorrectly stated the law as to perjured testimony. The trial court correctly held that admissions of prior perjury go to Bowen's credibility and the weight of the evidence to be given the testimony by the jury and do not affect Bowen's competency as a witness. *Commonwealth v. Orlosky*, 264 Pa.Super. 598, 401 A.2d 756 (1979); *Commonwealth v. Billingsley*, 160 Pa.Super. 140, 50 A.2d 703 (1947). 42 Pa.C.S. § 5912 provides that "[i]n a criminal proceeding, a person who has been *convicted* in a court of this Commonwealth of perjury ... shall not be a competent witness for any purpose...." (Emphasis added.) Bowen had never been convicted of perjury. Appellant failed to establish sociopathic behavior or perjury on the part of Bowen and the Commonwealth's prior knowledge of his perjury. He admitted testifying differently about who went into a room to get a jewelry box (Scaglione at his trial—Munchinski in the present proceeding) but in admitting the perjury stated he did so to protect his children (T.T., pp. 250–252). The trial court properly held the testimony of Bowen was admissible and its credibility was a matter for the jury, as the trier of fact, to decide. *Commonwealth v. Fahy*, 512 Pa. 298, 516 A.2d 689 (1986). Proof that Bowen was a sociopath and thereby incompetent to testify was never established. The perjury committed by appellant was not of such a substantial nature that the court was required to strike it, as opposed to permitting the jury to determine the credibility of appellant. Variations of

testimony by the same person from hearing to hearing notoriously occur, and a witness is more likely to be suspect if there are no variations, as one may suspect him of being coached or memorizing a script. If such variations were to be considered to render a party incompetent as opposed to effecting his credibility, few trials would be successfully concluded. Our reading of Mr. Bowen's testimony does not reveal the psychopathology and chronic pattern of lying which would render him incompetent to testify. For these reasons, appellant's claims are without merit.

## SECTION III

### Prosecutorial Misconduct

The next issues presented by appellant concern prosecutorial conduct and are stated as follows:

XIII. Did the district attorney of Fayette County, Pennsylvania, commit prosecutorial misconduct by calling a witness, Richard A. Bowen, knowing that the said witness was going to offer perjured testimony at the trial of this case?

XXVII. Did the prosecutor fail to disclose relevant information regarding the procurement of the testimony of Harold Eugene Thomas and has the Commonwealth systematically prevented the appellant and his present counsel from obtaining such information by interposing unconscionable delay?

As we indicated in the previous section, there was no error in presenting and hearing Richard Bowen's testimony and appellant's allegation in question XIII is totally without merit.

As to the failure of the Commonwealth to disclose relevant information regarding procurement of the testimony of Harold Thomas, the issue is waived as it was not raised in post-trial motions below. *Hreha v. Benscoter*, 381 Pa.Super. 556, 554 A.2d 525 (1989). Thomas testified that he talked to appellant in jail and appellant admitted the homicides, implicating Scaglione and Bowen. He gave a

statement to the police about the conversation with appellant in 1983 *after* he was released from jail on a bond. The statement was made one week before trial. The prosecutor denies any deal with Thomas, and Thomas, under cross-examination, denied any bargain (T.T., pp. 268–271). It was he who initiated the contact and not the police or prosecutor. He cannot be considered an agent of the Commonwealth and no tangible evidence has been provided to indicate a deal. We find no merit in appellant's insinuation of a deal and no supporting evidence thereof.

## SECTION IV

### Judicial Procedural Error

XIV. Did the honorable trial court commit reversible error when it failed to grant the motion of the appellant to dismiss one count of criminal homicide, since the conspiracy charge against the appellant was dismissed prior to trial by reason of the expiration of the statute of limitations and, therefore, appellant would not be a co-conspirator as to the homicide charge to the co-defendant Leon E. Scaglione?

XV. Was it reversible error for the court to charge the jury on second degree murder when the appellant was statutorily not guilty of any underlying felony by reason of the statute of limitations?

XVI. Did the honorable trial court commit reversible error when it permitted the jury to consider charges of murder in the second degree when there was insufficient evidence to establish the elements of any other crimes required pursuant to the felony murder rule?

XVIII. Were the verdicts of guilty of both first degree murder and second degree murder inconsistent and therefore, against the law?

XXIV. Whether the court below committed reversible error by invading the sole province of the jury and thereby determining the specific degree of guilt, when such ascertainment of specific degree is the exclusive

right and duty of the jury and the lower court had no authority to, in this manner, mold the jury's verdict and thereby usurp authority to impose sentence upon appellant when the court had no subject matter jurisdiction to impose sentence upon alleged verdicts?

The issue in question XIV was misstated by appellant and when properly framed to provide for accomplice culpability, it is readily apparent that the killings resulting from a joint enterprise requiring that each be charged with the killing by the other. The trial court clearly and properly dealt with this issue in its Opinion at section IV. 18 Pa.C.S. § 306 **Liability for conduct of another; complicity,** states:

(a) **General rule**—A person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both.

b) Conduct of another—A person is legally accountable for the conduct of another when:

(3) he is an accomplice of such other person in the commission of the offense.

c) Accomplice defined—A person is an accomplice of another person in the commission of an offense if:

(1) with intent of promoting or facilitating the commission of the offense ... (ii) aids or agrees or attempts to aid such other person in planning or committing it.

A principal and his accomplice share equal responsibility for their criminal acts, *Commonwealth v. Bradley,* 481 Pa. 223, 392 A.2d 688 (1978), and a charge for accomplice liability is proper even though defendant is charged in the indictment or information only as a principal. *Commonwealth v. Perkins,* 485 Pa. 286, 401 A.2d 1320 (1979). The Commonwealth charged and tried appellant with the robberies and killings in concert with Scaglione, even though indicted only as a principal. There was no error in this procedure.

 In question XV, appellant alleges the trial court erred in charging on second degree murder when he was not guilty of any underlying felony by reason of the statute of limitations. Again, appellant ignores the distinction between conspiracy which is governed by the statute of limitations, and murder, which is not. 42 Pa.C.S. § 5551 **No limitation applicable.**[3] The constituent element of second degree murder is the killing of a person in the course of committing a felony. It is not necessary to find the appellant guilty of a felony before a finding of second degree murder. If that were the case, no second degree murder verdict could be entered without first charging and finding the party guilty of the underlying felony. What is required is that the actor be found guilty of a homicide in the progress of committing a felony with sufficient evidence to establish a felony was in process and the killing occurred. Whether or not the statute of limitations has run on the underlying felony is immaterial, so long as the essential elements of second degree murder are proven beyond a reasonable doubt.

 Appellant alleges in question XVI that reversible error was committed by the court in charging second degree murder when insufficient evidence was presented to

**3.** Under the statute in effect at the time of the commission of this crime, the statute of limitations, in pertinent part, read:

**18 Pa.C.S. § 108. Time Limitations**

(a) **Murder.**—A prosecution for murder of the first degree or of the second degree may be commenced at any time.

As most recently amended in December of 1984, the statute currently reads as follows:

**§ 5551. No limitation applicable**

A prosecution for the following offenses may be commenced at any time:

(1) Murder.

(2) Voluntary manslaughter.

(3) Conspiracy to commit murder or solicitation to commit murder if a murder results from the conspiracy or solicitation.

(4) Any felony alleged to have been perpetrated in connection with a murder of the first or second degree, as set forth in 18 Pa.C.S. § 2502(a) or (b) and (d) (relating to murder).

The amendment makes more specific the application of the statute of limitations to murder and the underlying felonies but has no effect on the statute of limitations as to felony murder in this case.

establish the underlying felony. This argument is ludicrous. The crime began as a robbery and sodomy rape and ended in a homicide. Without question, the evidence presented established the requisite felony.

■ The inconsistency in the verdict proposed by question XVIII, between first degree murder and second degree murder, is meaningless in that the evidence was sufficient to find both. The court properly disposed of this issue by imposing the judgment of sentence on the first degree murder verdicts and by imposing no further penalty for the second degree murders. When such a verdict is returned, the court properly imposes the sentence on the most serious charge, which, here, is first degree murder. No prejudice results therefrom. This disposition also disposes of issue XXIV, in which appellant alleges the court invoked the province of the jury in entering the sentence on first degree murder, with no penalty imposed on second degree murder.

## SECTION V

### Ineffectiveness of Counsel

The final section is a grouping of the various questions raised throughout alleging ineffective assistance of counsel. These issues were left for last because many of the claims of ineffectiveness were disposed of above in determining the validity, or lack thereof, of other issues.

In this regard we note that the standard for reviewing the effectiveness of counsel is well-established.

We have taken great pains to set forth the criteria that must be established when one attempts to assert the ineffectiveness of counsel. The threshold inquiry in such claims is whether the issue/argument/tactic which counsel has forgone and which forms the basis for the assertion of ineffectiveness is of arguable merit; for counsel cannot be considered ineffective for failing to assert a meritless claim. *Commonwealth v. Pursell*, 508 Pa. 212, 495 A.2d 183 (1985). If this threshold is met, it must next be established that the particular course chosen by coun-

sel had no reasonable basis designed to effectuate his client's interests. *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967). Finally, we require that the defendant establish how counsel's commission or omission prejudiced him. *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987).

In making assertions of ineffectiveness, we also require that an offer of proof be made alleging sufficient facts upon which a reviewing court can conclude that trial counsel may have, in fact, been ineffective. This is so because we frown upon considering claims of ineffectiveness in a vacuum. *Commonwealth v. Pettus,* 492 Pa. 558, 424 A.2d 1332 (1981).

*Commonwealth v. Durst,* 522 Pa. 2, 4–5, 559 A.2d 504, 505 (1989). With these principles in mind, we turn to appellant's numerous claims of ineffectiveness.

XVII. Was former defense counsel, Charles C. Gentile, ineffective in his representation of appellant, by not properly objecting to the jury's verdict, or properly preserving and arguing whether the honorable trial court committed reversible error when it accepted jury verdicts which were contrary, or inconsistent to the court's instructions, and therefore illegal?

XIX. Was former defense attorney Charles C. Gentile ineffective in his representation of appellant for failing to object to, or otherwise preserve the issue of whether the honorable sentencing court imposed illegal and unauthorized sentences of two consecutive life terms for two alleged convictions of first degree murder; i) when appellant was acquitted of the two first degree murders by virtue of convictions of two second degree murders; and ii) where the only elements found by the jury in the instant verdicts, beyond a reasonable doubt, amounted to two convictions for third degree murder?

XX. Was former defense counsel Charles C. Gentile ineffective in his representation of appellant by failing to object, or otherwise preserve the question of whether the jury completed its duty and rendered verdicts warranted

by law, or were the verdicts which were rendered in this instance tantamount to the jury being undecided upon a verdict?

XXII. Was former defense counsel, Charles C. Gentile, ineffective in his representation for failing to object to, or otherwise preserve, the issue or whether the instant verdicts were a nullity based upon the two facts that appellant was convicted of four criminal homicides upon two informations; and that the verdicts of the jury nullified the elemental findings of one another?

XXIII. Was former defense counsel, Charles C. Gentile, ineffective in his representation of appellant by failing to object to, or otherwise preserve, the question of whether the honorable trial court committed reversible error when it accepted the jury's verdicts of guilty of both first and second degree murder for each of the two counts of criminal homicide, without returning the jury for further deliberations to ascertain a specific degree of guilt, thereby depriving the appellant of his fundamental right of due process and his right to the possible doubt which at least one juror could have had upon a closer examination of the evidence while ascertaining specific degree?

XXV. Was former defense counsel, Charles C. Gentile, ineffective by his failure to request a mistrial, or postponement of sufficient length, when it became apparent during the course of trial that appellant was severely ill and unable to fairly follow proceedings against him or assist in his defense, because of the illness; and when, after being treated for such illness the appellant was under the influence of certain physician prescribed drugs, which affected appellant's judgment?

XXVI. Was former defense counsel, Charles C. Gentile, ineffective by his failure to move for a mistrial after the court had ordered the district attorney to prosecute Richard A. Bowen for perjury?

■ Question XVII was answered in section IV, Judicial Procedural Error. The jury verdicts were both returnable, although sentence could only be imposed on one. *Com-*

*monwealth v. Kozrad,* 346 Pa.Super. 470, 499 A.2d 1096 (1985). Since the trial court properly disposed of any conflict in his sentence, counsel could not be found ineffective for failing to object.

Question XIX is also answered by section IV, in that the jury could, and did, find both first and second degree murder, although appellant could be sentenced on only one. Second degree murder is not a lesser included offense of first degree murder, as is third degree murder. Therefore, both findings were possible without conflict. However, for sentencing purposes, only one could be the focus for sentencing, that one being the higher degree. Since the court was correct in sentencing, counsel could not be ineffective.

Issue XX has been fully discussed and resolved above to the effect that the jury returned guilty verdicts on both degrees of murder, which were supported by the evidence. The jury could not be deemed undecided and counsel was not ineffective for failing to object.

Question XXII is partly redundant and partly nonsense. The jury could properly find four degrees of murder on two informations. The court could only sentence on two, the evidence supporting the sentence on the crime of the highest degree.

■■ Issue XXIII is resolved by all of the above. The trial court was not required to return the case for further deliberation when both degrees of murder were sustainable on the evidence. Counsel was not ineffective in failing to request further deliberations. He could hope the trial court would elect the less serious charge.

■■ As to question XXV, the illness of defendant apparently was not sufficient to continue the trial. In the event appellant was unable to attend, the court could continue without him. Counsel was not ineffective for refusing to take that chance.

■■ Finally, issue XXVI does not present a question of ineffectiveness since a direction to the prosecutor by the

court to prosecute Bowen for perjury was not material to his competency and the issue of his earlier perjured statement went only to his credibility. As such, a mistrial was not warranted.

Judgment of sentence affirmed.