**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-3416
_____


DAVID JOSEPH MUNCHINSKI

v.

HARRY WILSON, Warden of the State Correctional
Institute of Fayette;
ATTORNEY GENERAL OF THE STATE OF
PENNSYLVANIA,
Appellants
_____


On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court No. 2-07-cv-01712
Magistrate Judge: The Honorable Lisa P. Lenihan

Argued June 27, 2012

Before: SMITH and JORDAN, *Circuit Judges*

RAKOFF, *Senior District Judge*[*]

(Filed: September 11, 2012)

Noah Geary     [ARGUED]
Suite 225
Washington Trust Building
Washington, PA
        *Counsel for Appellee*

Gregory J. Simatic     [ARGUED]
Office of Attorney General of Pennsylvania
Appeals & Legal Services Section
564 Forbes Avenue
6th Floor
Pittsburgh, PA
        *Counsel for Appellant*

————————————

OPINION

————————————

SMITH, *Circuit Judge.*

————————————

[*] The Honorable Jed S. Rakoff, United States Senior District Judge for the United States District Court for the Southern District of New York, sitting by designation.

In 1986, David Munchinski was convicted of two counts of first-degree homicide and two counts of second-degree homicide arising out of a pair of murders that occurred in 1977 in Bear Rocks, Pennsylvania (the "Bear Rocks Murders" or the "murders"). In the years following his conviction, Munchinski discovered that prosecutors had withheld from his counsel almost a dozen articles of exculpatory evidence. After unsuccessfully petitioning for post-conviction relief several times in state and federal court, Munchinski filed a second or successive habeas petition pursuant to 28 U.S.C. §§ 2244 & 2254(d) in the United States District Court for the Western District of Pennsylvania. Munchinski argued that the Pennsylvania Superior Court unreasonably applied *Brady v. Maryland*, 373 U.S. 83 (1963), when it declined to grant Munchinski post-conviction relief based on several articles of exculpatory evidence that were unlawfully withheld by the prosecution.

The District Court found some of Munchinski's claims untimely under 28 U.S.C. § 2244(d)(1)(D), but equitably tolled the statute of limitations for a subset of those claims. The District Court next concluded that Munchinski had procedurally defaulted certain claims. The District Court excused his procedural default, finding that applying the procedural default doctrine to Munchinski's petition would effect a fundamental miscarriage of justice. Finally, the District Court agreed

3

with Munchinski that the state court had unreasonably applied *Brady*. The District Court granted Munchinski's petition.

Warden Harry Wilson and the Pennsylvania Attorney General (collectively, the "Commonwealth") appeal from the District Court's judgment. The Commonwealth concedes that it cannot "make a compelling argument" that the Superior Court properly applied *Brady* given the nature of the evidence that was withheld. Oral Arg. Tr. 4:8-9. We agree. The scope of the *Brady* violations here is staggering, and the Superior Court failed to appreciate the aggregate impact of the withheld evidence.

In apparent recognition of that reality, the Commonwealth limits its appeal to three issues: (1) whether the District Court erred by equitably tolling the statute of limitations in § 2244(d)(1)(D); (2) whether the District Court erred by excusing Munchinski's supposed procedural default on the basis of a fundamental miscarriage of justice; and (3) whether Munchinski has produced sufficient evidence "to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense," 28 U.S.C. § 2244(b)(2)(B)(ii).

We conclude: (1) that the District Court appropriately tolled the statute of limitations; (2) that

4

Munchinski did not procedurally default his claims; and (3) that Munchinski has demonstrated his actual innocence by clear and convincing evidence, as is required by § 2244(b)(2)(B)(ii). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, --- U.S. ---, 131 S. Ct. 770, 786 (2011) (internal quotation marks omitted). Like the District Court, we see precisely such an "extreme malfunction[ ]" in this case. Consequently, we will affirm the judgment of the District Court granting Munchinski a writ of habeas corpus pursuant to § 2254(d)(1).

## I.

On December 2, 1977, Pennsylvania State Police found the bodies of two men in and around a cabin owned by Raymond Gierke in Bear Rocks, located in Fayette County, Pennsylvania.[1] These two bodies were later identified as those of Gierke and James Peter Alford.

---

[1] The parties have not produced the trial testimony and other evidence that was actually presented at trial. We take the facts as recited by the Pennsylvania Superior Court in its adjudication of Munchinski's state court petition for post-conviction relief.

5

The police notified Fayette County Deputy Coroner Jack Powell, who transported the bodies from the crime scene in order to conduct autopsies. Autopsies were conducted that same day by pathologist Dr. Sava Radisavljevic ("Dr. Sava"). On December 9, 1977, Dr. Sava delivered his autopsy report to the Fayette County Coroner's Office. A week later, he delivered addenda to his report.[2] The report and the addenda made clear that Gierke and Alford were shot multiple times at close range and died from their gunshot wounds. The report and addenda also suggested that both Gierke and Alford had been anally raped prior to the murders.

The Pennsylvania State Police assigned Trooper Montgomery Goodwin as the lead investigating officer in the case. Trooper Goodwin worked with Corporal Robert Mangiacarne over the course of the next five years investigating the murders. Though Trooper Goodwin and Corporal Mangiacarne identified several suspects, they lacked sufficient evidence to file charges until 1982.

A.

At some point within the period of 1980 and 1981, Richard Bowen, a convicted burglar and forger incarcerated in state prison in Greensburg, Pennsylvania,

---

[2] Dr. Sava died on December 19, 1977, two days after the addenda were delivered to the coroner's office.

6

contacted the Pennsylvania State Police claiming knowledge of the Bear Rocks Murders. The precise dates of the conversations between Bowen and the police remain unknown and the exact nature of those conversations remains unclear. What is certain is that Bowen's statements were inconsistent and contradictory. Two of these inconsistencies are most remarkable for our purposes: (1) Bowen initially implicated only Leon Scaglione, the man who was eventually tried and convicted along with Munchinski; and (2) Bowen at first stated that he did not enter Gierke's home during the shootings and did not directly witness the murders.

There were numerous changes in Bowen's account of the murders; at some point Bowen's story changed such that he was a direct witness to the shootings, which he claimed were committed by Scaglione as well as Munchinski in a drug-related dispute.[3] On October 22, 1982, Munchinski and Scaglione were charged with two counts of criminal homicide in violation of 18 Pa. Cons. Stat. Ann. § 2501(a), and two counts of criminal conspiracy to commit homicide in violation of 18 Pa. Cons. Stat. Ann. § 903.

Munchinski and Scaglione were tried jointly in

---

[3] Even this fact was not consistent in Bowen's various accounts. Initially, Bowen claimed that the murders were "a contract hit, [and] that a doctor or a lawyer paid him[.]" Munchinski App'x 197.

April 1983 (the "First Trial"). At this trial, the Commonwealth relied principally on Bowen's purported eyewitness testimony. Bowen testified that he directly witnessed Munchinski and Scaglione commit the murders. Specifically, Bowen testified that Gierke and Alford were raped by Scaglione and Munchinski, respectively, and that the two victims were murdered almost immediately thereafter. Bowen's trial testimony was markedly different from the stories he reportedly told police when he first approached them as a potential witness. Bowen's testimony was also at odds with certain facts that were elicited at trial. For example, Bowen claimed that he drove Scaglione and Munchinski to the site of the murders in Scaglione's lime green Ford Gran Torino. Scaglione, however, did not purchase that Gran Torino until almost six months after the murders.

The Commonwealth also presented testimony from Lori Lexa and Deborah Sue Dahlmann. Lexa and Dahlmann, acquaintances well before their involvement in this case, claimed that Munchinski and Scaglione were with them in a bar in January 1978, and that Munchinski and Scaglione admitted to committing the murders. Dahlmann's ex-husband Ed Wiltrout, however, was a prime suspect in the Bear Rocks murders; unbeknownst to Munchinski, at least one witness claimed to police that Wiltrout was one of the shooters. Munchinski was unable at trial to cross-examine Dahlmann with the witness statement implicating Wiltrout because the report

documenting that statement had not been produced. The Commonwealth relied exclusively on testimony from Bowen, Lexa, and Dahlmann to link Munchinski to the crime, presenting no physical evidence linked to Munchinski.

On April 12, 1983, the First Trial ended with a hung jury and the declaration of a mistrial. The Commonwealth dropped the conspiracy charges against Munchinski and severed Munchinski's case from Scaglione's case. In October 1986, the Commonwealth retried Scaglione. During his trial, Scaglione admitted to committing the murders. Scaglione testified that Munchinski had no involvement in the murders, but that Scaglione had committed the crimes with an associate named Homer Stewart who allegedly resembled Munchinski. Scaglione was convicted of two counts of first degree homicide and two counts of second degree homicide.

In November 1986, the Commonwealth retried Munchinski (the "Retrial"). The Commonwealth's case still consisted solely of witness testimony allegedly linking Munchinski to the murders. The Commonwealth again elicited testimony from Bowen, Lexa, and Dahlmann, which was largely consistent with their testimony from the First Trial. The Commonwealth also introduced testimony from two additional sources: (1) Bernard Furr, another acquaintance of Dahlmann's, who repeated a story very similar to Dahlmann's about an

alleged confession in January 1978; and (2) Harold Thomas, who testified that Munchinski confessed while in jail in 1983.

During the Retrial, Munchinski sought to introduce Scaglione's testimony from his October 1986 retrial, where he implicated Stewart and exonerated Munchinski. Scaglione declined to testify, invoking his Fifth Amendment right against self-incrimination. Munchinski requested that the court grant Scaglione use immunity, but the court refused. Additionally, the trial court ruled that Scaglione's prior testimony was inadmissible under Pennsylvania law. As a result, Munchinski was unable to introduce any exculpatory testimony from Scaglione.

In his closing arguments, then-Assistant District Attorney Ralph Warman stated to the jury: "did you hear anyone testify that Bowen received anything other than immunity? No . . . does that bolster his testimony to indicate that Bowen was there?" Munchinski App'x 42. This argument misled the jury. Unbeknownst to the jury and Munchinski, prosecutors in Fayette County had reached a leniency agreement with Bowen, whereby prosecutors in Westmoreland County would act leniently against Bowen in his ongoing parole revocation hearings in exchange for Bowen's testimony against Munchinski. The Commonwealth failed to turn over to Munchinski documents evidencing this leniency agreement.

Munchinski was found guilty of two counts of

first-degree homicide and two counts of second-degree homicide. On June 15, 1987, Munchinski was sentenced to two consecutive life sentences, one for each of the first degree murder convictions. Munchinski received no additional penalties for the two second degree convictions.[4]

On July 14, 1987, Munchinski appealed from the judgment of sentence. On November 30, 1990, the Pennsylvania Superior Court affirmed. *Commonwealth v. Munchinski*, 585 A.2d 471, 476 (Pa. Super. Ct. 1990). Munchinski then sought allocatur from the Pennsylvania Supreme Court. That court denied review on November 13, 1991.

B.

In November 1991, while imprisoned in Oklahoma, Bowen asked to speak with the Federal

---

[4] Munchinski argued on appeal that his convictions were multiplicitous, and that he could not be convicted of two counts of first degree murder and two counts of second degree murder in connection with Gierke's and Alford's murders. On appeal, the Pennsylvania Superior Court held that by declining to impose an additional sentence for the second degree murder convictions, the trial court had effectively merged the first degree and second degree counts for each of the two murders. *See Commonwealth v. Munchinski*, 585 A.2d 471, 479 (Pa. Super. Ct. 1990).

Bureau of Investigation ("FBI") about the Bear Rocks Murders. Bowen was soon contacted by FBI Special Agent Matthew Schneck. In talking with Agent Schneck, Bowen recanted his trial testimony, saying that "he was not involved in any fashion with Scaglione or Munchinski in the . . . killings of Alford and Gierke." Munchinski App'x 42.

Munchinski was soon made aware of Bowen's statement to Special Agent Schneck. On April 4, 1992, in response to Bowen's recantation, Munchinski deposed Bowen. Bowen testified that he fabricated his trial testimony, and admitted that he was not in Pennsylvania on the night of the murders. Bowen claimed that police and prosecutors had threatened him. If he did not testify against Munchinski and Scaglione, Bowen said, "they would have someone come along and say that they were present and that I had done the shootings." Bowen Dep. 13:7-9. Bowen maintained that Scaglione admitted to committing the murders, but that Scaglione "never did mention [Munchinski's] name." *Id.* at 21:15.

Bowen also explained why his fabricated account of the murders changed over time. Specifically, he testified that he would rehearse his story with Trooper Goodwin, and that Goodwin would give him instructions:

> A: [Trooper Goodwin] asked me about the story, and I went over it, you know, a couple different times. And

12

then, he started with "No, this is what happened"--you know--"and we have witnesses to verify this." And, he started in with the [sic] I was driving the car and I told him, you know "[y]ou're crazy. You people can't prove none [sic] of this." "We got witnesses." And then, he started with a--he pulled a warrant out of hand--I never did see if it was signed or what it said--but he was reading on that where all he had to do is sign my name and I would be charged in the murder.

\* \* \*

Q: And, whenever this occurred, did Trooper Goodwin tell you that he wanted you to give him a different story?

A: He told me the story, and then he said if I didn't go along with that, then I would be charged in the homicide.

*Id.* at 23:11-22, 24:4-9. Notably, Trooper Goodwin was responsible for the change between Bowen's first account, when he claimed that he remained in the car, to his later accounts, when he claimed that he went into the

13

cabin and directly witnessed the murders.[5]  Bowen claimed that he changed this part of his story because Trooper Goodwin "said that they had to have [him] in the house." *Id.* at 61:16-17.

Bowen further testified about how he prepared for trial with former District Attorney Gerald Solomon, the lead prosecutor during the First Trial:

> Q:    And, did [Solomon] tell you what to say?
>
> A:    Yes.
>
> Q:    Did you tell him that you were not present at the killings?
>
> A:    He knew I wasn't.  Yes, I told him

---

[5] In 1988, years after Munchinski's arrest, Trooper Goodwin was convicted of third-degree murder of a man who was seen dancing with his wife. *See* Munchinski App'x 44.  Trooper Goodwin was sentenced to a 10-20 year prison sentence, and was ultimately released on parole in 2008, after serving nearly 20 years in prison. *See id.*; *Former State Trooper Out of Prison*, Tribune Democrat, May 23, 2008, *available at* http://tribune-democrat.com/local/x519164954/Former-state-trooper-out-of-prison/print (last visited August 30, 2012).

14

that. I said, I--it was just a "I can't do this, man. This ain't right." And, it's--you know "[t]his is done all the time. We know they did it. We just-- we have to put somebody there to say they seen them."

Q:     And, that's what he told you?

A:     Yes.

Q:     And, he knew that you weren't there?

A:     Yes, he did.

*Id.* at 42:7-20.

Finally, Bowen described how he came to know so many details about the murders. He explained that Trooper Goodwin showed him several photos of the crime scene, and even took him to the scene and pointed out where the bodies were found. Bowen also confirmed that Trooper Goodwin gave him details about Scaglione's lime green Gran Torino, and pressed him to include that information in his testimony; apparently neither of them was aware that Scaglione had not purchased his lime green Gran Torino until well after the murders.

On April 16, 1992, only a few weeks after Bowen's deposition, Munchinski filed his first petition for relief under the Pennsylvania Post-Conviction Relief

15

Act ("PCRA"), 42 Pa. Cons. Stat. Ann. § 9541, *et seq.* (the "PCRA I" petition). The PCRA I petition sought relief based on two articles of newly-discovered evidence: (1) a September 1982 report from Trooper Goodwin (the "Goodwin Report") that was intentionally edited to conceal a reference to a recorded statement made by Bowen; and (2) Bowen's sworn deposition testimony. PCRA petitions are generally assigned to the judge who presided over a petitioner's trial. In this case, however, the judge who had presided over the First Trial and the Retrial had retired from the bench, so the PCRA I petition was assigned to Judge William J. Franks of the Court of Common Pleas of Fayette County.

Judge Franks held an evidentiary hearing concerning both of Munchinski's evidentiary claims. Former prosecutors Solomon and Warman testified at the hearing about the Goodwin Report. Warman, the Commonwealth's lead prosecutor during the Retrial, admitted that he intentionally edited the Goodwin Report to remove a paragraph referencing a recorded statement from Bowen, and spliced together the paragraphs before and after the removed text in order to conceal the removal. Warman testified that he intentionally removed the relevant paragraph because no statement from Bowen was ever transcribed or recorded and that the reference would be "misleading." Solomon, who was Warman's supervisor during the Retrial, corroborated Warman's testimony.

16

Judge Franks credited Warman's and Solomon's account, finding that Bowen's statement was never recorded. Nonetheless, troubled by Warman's intentional modification of the Goodwin Report, Judge Franks ordered an *in camera* review of all of the Pennsylvania State Police investigative files related to the Bear Rocks Murders, including several additional files relating to Bowen. Judge Franks ordered the Commonwealth to turn over all documents that he deemed discoverable. The Commonwealth, however, failed to turn over several critical articles of evidence to the PCRA I court for its *in camera* review, rendering that review incomplete.

As to Bowen's deposition testimony, Munchinski called Bowen to testify and recant his trial testimony. Bowen, however, invoked his Fifth Amendment right against self-incrimination. Judge Franks granted Bowen use immunity for his testimony. At the hearing, Bowen disavowed his deposition testimony and reaffirmed his testimony from the Retrial.[6] Bowen subsequently

---

[6] In 1995, Munchinski filed a private criminal complaint against Bowen for perjury during his civil deposition. Munchinski's complaint was dismissed, however, on the ground that Judge Franks had granted Bowen use immunity for his testimony at the evidentiary hearing. *See Commonwealth ex rel. Munchinski* v. *Bowen*, No. 1706 Pittsburgh 1995, at *1-2 (Pa. Super. Ct. filed Apr.

committed suicide.

Munchinski also adduced testimony from Kenneth Knight, an acquaintance of Bowen's from prison. Knight testified that Bowen admitted that he was in Oklahoma at the time of the murders, and that he lied under oath during the Retrial. Further, Knight testified that he had personally introduced Bowen to Scaglione and Munchinski in March 1978, long after the Bear Rocks Murders, when all four of them were incarcerated together in Westmoreland County Jail.

On August 5, 1993, based on the limited *Brady* violations that were known and alleged at the time, Judge Franks dismissed Munchinski's PCRA I petition. Munchinski appealed this decision. On December 11, 1995, the Pennsylvania Superior Court affirmed the dismissal of the PCRA I petition. Munchinski sought review by the Pennsylvania Supreme Court. That Court denied allocatur on August 30, 1996.

_____

16, 1996) (unpublished memorandum). Judge Feudale, who presided over the PCRA III proceedings, found this troubling—the prosecution apparently threatened Bowen with perjury charges if he did not retract his recantation, but then Bowen was granted use immunity, and protection from any resulting perjury charges, if he reaffirmed his prior testimony. Although we understand Judge Feudale's concern, it has no bearing on the issues before us now.

18

On January 6, 1998, Munchinski filed his first habeas petition under 28 U.S.C. § 2254. The United States District Court for the Western District of Pennsylvania dismissed the petition as untimely on September 30, 1998. Munchinski appealed the dismissal of his petition to this court (the "Appeal").

On May 12, 2000, while the Appeal was pending before this court, Munchinski filed a second PCRA petition *pro se*. That petition raised additional *Brady* claims based on allegedly withheld evidence that Munchinski discovered while his first federal habeas petition was pending. Six days later, on May 18, 2000, that *pro se* petition was dismissed because Munchinski was still represented by counsel. On July 27, 2000, Munchinski refiled his petition through counsel (the "PCRA II" petition).

The PCRA II court never reached the merits of Munchinski's *Brady* claims. Rather, based on a misunderstanding of Pennsylvania law, Judge Franks erroneously concluded that the PCRA II court lacked jurisdiction over Munchinski's petition because the Appeal remained pending in federal court. Judge Franks stated:

> After full review of the Petition and record, this Court finds that an appeal was filed to the United States Court of Appeals for the Third Circuit and is still pending. This

19

> Court has no jurisdiction. Defendant is not entitled to post-conviction collateral relief, and further proceedings would serve no legitimate purpose. Pa. R. Crim. P. section 1507(a).

Order Dismissing PCRA II Pet., August 24, 2000, *Munchinski v. Wilson*, No. 07-cv-1712, ECF No. 21-12.[7]

After disclaiming jurisdiction, Judge Franks stated that Munchinski could appeal within thirty days from the date of the court's order. Perhaps knowing that the Appeal would be resolved imminently, Munchinski declined to appeal the PCRA II Court's decision. Instead, he heeded Judge Frank's implicit suggestion and waited to re-file his petition after the Appeal was decided, when the state court could properly exercise jurisdiction over his petition. On January 24, 2001, we decided the Appeal, affirming the dismissal of

---

[7] On August 3, 2000, Judge Franks issued an order stating that the PCRA II court "ha[d] no jurisdiction" over the petition. Order, August 24, 2000, *Munchinski v. Wilson*, No. 07-cv-1712, ECF No. 21-11. This order did not formally dismiss Munchinski's petition, but noted that the court would dismiss his petition for lack of jurisdiction unless Munchinski could provide "an appropriate response." When no appropriate response was filed, Judge Franks dismissed Munchinski's petition on August 24, 2000.

Munchinski's first habeas petition.

## C.

### 1.

On March 21, 2001, less than sixty days after we decided the Appeal, Munchinski filed his third PCRA petition (the "PCRA III" petition). In the interim, former prosecutors Warman and Solomon had each been elevated to the bench of the Court of Common Pleas of Fayette County. This led all the sitting judges of the Court of Common Pleas of Fayette County to recuse themselves from the matter. The Administrative Office of Pennsylvania Courts assigned the PCRA III Petition to Judge Barry Feudale of the Court of Common Pleas of Northumberland County.[8] Additionally, because of allegations of misconduct made against First Assistant District Attorney John Kopas, who represented the Commonwealth during the PCRA I proceedings, the Commonwealth's case was taken over by the Pennsylvania Attorney General's Office.

---

[8] Judge Feudale was elected to the Court of Common Pleas of Northumberland County in 1987. He became that court's President Judge in 1995, and took senior status in 1998. In 2004, after issuing his opinion in this case, Judge Feudale was appointed as a visiting Senior Judge of the Commonwealth Court of Pennsylvania.

The PCRA III petition raised several *Brady* claims. Munchinski twice moved to amend that petition to include additional claims based on evidence he uncovered after filing the PCRA III petition. Both of these motions were granted. In sum, Munchinski raised *Brady* claims based on the following eleven articles of material exculpatory evidence that were allegedly suppressed by the Commonwealth, in addition to the Goodwin Report that was the subject of the PCRA I petition:

1. Sava Addendum: an addendum to Alford's autopsy report from Dr. Sava indicating that the semen sample taken from Alford's rectum was of blood type "A." Munchinski is of blood type "B."[9] Munchinski App'x 167.

2. Parole Revocation Documents: a set of documents related to Bowen's 1983 parole revocation hearings evidencing a previously-undisclosed leniency agreement between

[9] Dr. Sava does note that cross-contamination from Alford's own semen could not "be entirely ruled out" based on the low number of spermatozoa found in Alford's rectum. As the District Court noted, however, even if the collected sperm was from Alford, that fact by itself would cast further doubt on Bowen's testimony that Munchinski raped Alford.

Bowen, the Westmoreland County District Attorney's Office, and the Fayette County District Attorney's Office. Munchinski App'x 168-71.

3. Bates Report: a January 7, 1978 report from Trooper George F. Bates discussing an interview with a witness who stated that Bowen had left Pennsylvania for Oklahoma on December 1, which, if referring to December 1, 1977, would have been the day before the murders. Munchinski App'x 158.

4. Goodwin/Powell Report: a December 20, 1977 report from Goodwin in which Deputy Coroner Powell stated his belief that the anal intercourse to which Alford was subjected took place 24 hours prior to his death, thereby inconsistent with Bowen's account of the murders. Commonwealth App'x 218.

5. Powell Addendum: a typewritten summary of a phone call from Deputy Coroner Powell reaffirming his belief, recorded in the Goodwin/Powell Report, that Alford was subjected to anal intercourse "at least 24 hours" prior to his murder. Commonwealth App'x 219.

6. Mangiacarne/Carbone Report: a December

23

16, 1980 report from Corporal Mangiacarne describing an interview with Elizabeth Carbone. Carbone related a detailed confession given to her that implicated Ed Wiltrout, Commonwealth witness Dahlmann's ex-husband. Commonwealth App'x 220.

7. Kinch Report: a December 19, 1977 report from Trooper Robert Kinch describing nail scrapings and other biological evidence that had been taken from Alford. The existence of this evidence was not disclosed to Munchinski before the First Trial or the Retrial. Commonwealth App'x 221.

8. Dunkard/Proud Report: a December 5, 1977 report from Trooper Edward Dunkard relating a discussion with Delores Proud, a dispatcher for the Mount Pleasant, Pennsylvania Police Department. According to the report, Proud received a call at approximately 2:32 A.M. on December 2, 1977, from a telephone operator who allegedly received a call from Gierke claiming that he had been shot. Proud also received a call requesting an ambulance approximately 18 minutes after Gierke's call. The call was from Bonnie Blackson, who had discovered Alford's

24

body.[10]   Commonwealth App'x 223.   The timing of these calls was inconsistent with the account provided by Bowen.

9.  Veil/Mangello Report:   a June 23, 1986 report from Trooper Richard Veil describing an interview with inmate Robert Lee Mangello, in which Mangello indicated that the Bear Rocks Murders were committed by Scaglione, Joseph Lucy, and a third, unnamed man.  Commonwealth App'x 216.

10. Madden/Lucy Report:  an October 15, 1986 report from Trooper William F. Madden describing an interview with Lucy, in which Lucy denied Mangello's accusations.  Lucy claimed that Mangello himself was a direct witness of the Bear Rocks Murders. Commonwealth App'x 217.

---

[10] Although the caller did not identify himself on the phone, blood found on the phone in Gierke's cabin was matched to Gierke's blood type.  The PCRA III Court and the District Court proceeded on the assumption that the call was placed by Gierke.  Based on that assumption, the timing of these calls could be said to conflict with the account provided by Bowen, who suggested at one point during trial that Gierke was shot in the head, which would of course make it unlikely that Gierke would make a later phone call.

11. Bates II Report: a second copy of the Bates Report that was marked-up, allegedly by the Commonwealth. Notably, the passage "and BOWEN left on the 1st of December" was highlighted. Munchinski App'x 159.

Judge Feudale held several days of hearings on the PCRA III petition. The parties presented testimony from Judge Franks, who had presided over the PCRA I petition. Judge Franks testified that, had he been aware of the Bates Report, the Goodwin/Powell Report, and the Mangiacarne/Carbone Report (i.e., had Kopas produced the entire prosecution file as per his order, rather than intentionally withholding material evidence from his *in camera* review), he may well have granted relief on Munchinski's PCRA I petition. *See* Munchinski App'x 112.

Judge Feudale also heard testimony from Warman and Trooper Goodwin about the recorded statement referenced in the Goodwin Report, that the PCRA I court concluded did not exist. Trooper Goodwin, who was at the time "serving a 10-20 year [prison] sentence for the murder of a man involved with his estranged wife," Munchinski App'x 44, testified that he personally observed Warman recording Bowen's statement on a tape recorder. Goodwin confirmed that the whole purpose of speaking with Bowen was to get a recorded statement, noting that without a recording "[h]e could change his story." Munchinski App'x 96.

26

Trooper Goodwin commented that he drafted his report the day after Bowen made his statement, and that his report was thus a timely recording of the discussion with Bowen. Finally, Trooper Goodwin noted that his report, including the reference to the recording, was approved by his supervisor, who was also present when Bowen made his statement. Trooper Goodwin noted that his supervisor would not have approved his report had such an important fact been incorrect.

Warman maintained that Bowen's statement was never tape recorded. Throughout the proceedings, Warman was openly hostile to questions. When asked why he did not approach the Court before editing the Goodwin Report, he responded that "he didn't have to." Munchinski App'x 102. When asked why he didn't obtain a written statement from Bowen, he replied: "Why would I want to do that? That's a police job, not mine." *Id.* at 103. When counsel suggested that a written statement may have been a good idea because Bowen could simply disappear before trial, Warman responded "[t]hat wouldn't be [his] problem"[11] because

---

[11] Though the audio recording of the PCRA III proceedings was not produced to our court and has no bearing on the merits of the instant appeal, Judge Feudale noted that when Warman made this statement, "there was a collective and audible gasp from the crowded courtroom." Munchinski App'x 103 n.3. Judge Feudale

27

he was "not the investigator . . . . We don't go out and do that kind [o]f thing." *Id.* at 103-04. Warman admitted that if a police officer had altered the report, the officer might be guilty of tampering with evidence, but maintained that his conduct was permissible because he was a prosecutor, not a police officer. *Id.* at 104.

In addition to hearing testimony about the alleged recorded statement, Judge Feudale heard testimony from Kopas about his conduct during the PCRA I proceedings. Kopas acknowledged that he confirmed to the PCRA I court, "[a]s an Officer of the Court," that he submitted the entire police file to Judge Franks for *in camera* review. Munchinski App'x 108. He could not explain why the files he turned over "included none of the eleven pieces of exculpatory evidence at issue." *Id.* Throughout the hearing, Kopas was evasive. Kopas repeatedly responded to questions by stating that he could not or did not recall the requested information. Judge Feudale noted that in contrast to his statements during the PCRA I hearings, Kopas's testimony in the PCRA III hearings was couched in "equivocal language." *Id.*

Finally, based on the Kinch Report's references to several articles of physical evidence that were never submitted for laboratory testing, the PCRA III Court

_____

also noted that "the comment and response was unlike anything [he had] perceived in [his] 15 years on the bench." *Id.*

28

ordered testing of all evidence still in existence. The test results were inconclusive, and were matched either to the victims or an unidentifiable male.

On October 1, 2004, Judge Feudale filed a strongly-worded 114-page opinion thoroughly analyzing the merits of the PCRA III petition, and granting Munchinski's petition.[12] At the outset of his opinion, Judge Feudale remarked on the nature of the *Brady* claims in this case:

> As a general observation, in the past seventeen years we have presided over numerous PCRA petitions, both counseled and uncounseled. Incantations of prosecutorial/police misconduct, corruption and perjury along with utterances of egregious and outrageous [sic], often appeared formulaic, and were ostensibly an elevation of form over substance. At a minimum, the circumstances surrounding these homicides, and the subsequent events involving the principal cast of characters in

---

[12] Judge Feudale granted the Commonwealth leave to retry Munchinski if the Commonwealth produced a copy of the recorded statement referenced in the Goodwin Report within ten days of the court's order. If the Commonwealth could not produce the recorded statement, Munchinski was to be released.

29

this tragic drama lend themselves to the term extraordinary.

Munchinski's App'x 40.

The PCRA III court concluded that: (1) despite the PCRA I Court's conclusion to the contrary, the recorded statement referred to in the omitted paragraph of the Goodwin Report did exist, and was intentionally withheld by prosecutors; (2) even if no recorded statement existed, Warman's intentional editing of the Goodwin Report violated *Brady*; (3) Kopas intentionally committed prosecutorial misconduct in violation of *Brady* when he failed to turn over the entire police file, as ordered during the PCRA I proceedings; (4) Solomon and Warman both committed prosecutorial misconduct and numerous *Brady* violations leading up to and during the First Trial and the Retrial; and (5) Warman intentionally misled the jury during the Retrial when he stated that all Bowen received in exchange for his testimony was immunity, because he was aware that Bowen also received leniency as to a number of probation and parole violations in Westmoreland County.

The PCRA III court also concluded that the evidence withheld by prosecutors was material under *Brady*, and granted Munchinski's petition. The court concluded that Warman, Solomon, and Kopas all engaged in serious and intentional prosecutorial misconduct. Judge Feudale declined to refer the former

30

prosecutors to the Judicial Conduct Board or for possible criminal charges because such a referral was not "within the clear ambit of relief set forth in Section 9546 of the [PCRA]." Munchinski App'x 33.

In a footnote to his order, Judge Feudale excoriated Warman, Solomon, and Kopas, stating that their "actions ill served the victims, their families, the defendant and citizens of Fayette County," and suggesting that the outcome of the case was "a reflection of the ongoing foundation of prosecutorial misconduct by the former prosecutors." Munchinski App'x 32. Judge Feudale commented that in his "17 years as a judge, while [he has] handled numerous PCRA's [sic], and granted collateral relief, this is the first time [he has] granted a request for new trial/discharge." *Id.* Judge Feudale closed by characterizing the matter before him as "an extraordinary case" and expressing the hope "that [it] is not replicated[.]" *Id.* at 33.

2.

On October 8, 2004, the Commonwealth appealed from the PCRA III court's grant of relief to Munchinski. On December 14, 2005, the Pennsylvania Superior Court issued a nonprecedential and unsigned memorandum opinion reversing the PCRA III court. Because the Superior Court's opinion is the focus of our review, we will subject it to painstaking analysis. Unfortunately, though the Superior Court's opinion is lengthy, its

31

reasoning is opaque. The memorandum is confusing, and at times internally inconsistent. As best we can understand, the Superior Court concluded that certain articles of evidence listed in the PCRA III petition as undisclosed by the prosecution were not raised on a timely basis, and thus could not be raised as independent claims. Nonetheless, because some of Munchinski's claims were timely, the court concluded that it was required to consider *all* of the evidence raised in the PCRA III petition. In analyzing the merits of Munchinski's *Brady* claims, the court considered each article of evidence in isolation, never considering the aggregate materiality of all of the withheld evidence.

The Superior Court began its opinion with a discussion of the jurisdictional restrictions on courts reviewing a PCRA petition, noting that "Pennsylvania courts have no jurisdiction to address claims in an untimely PCRA petition no matter how serious the assertions raised therein[.]" App'x 113. Munchinski argued that his petition was timely under Pennsylvania's "after-discovered evidence exception." App'x 116-18; 42 Pa. Cons. Stat. Ann. § 9545(b)(2) (after-discovered evidence exception). The Superior Court suggested that some of Munchinski's claims were filed beyond the sixty-day limitations period for after-discovered evidence.

Significantly, the Court's analysis did not end there. Up to this point in the opinion, the Superior Court

32

had not considered the articles of evidence that were discovered between the filing of Munchinski's PCRA II petition and his PCRA III petition. Munchinski discovered a report of Sergeant George Fayouk's interview of Richard Bowen between February 20, 2003 and March 10, 2003. The court concluded that Munchinski "asserted the claims based thereon within sixty days of its discovery. Thus all such claims are timely." App'x 133. Additionally, the court noted that Munchinski timely raised the Veil/Mangello Report and the Madden/Lucy Report. As such, the court "agree[d] with the third PCRA court that Munchinski raised cognizable *Brady* claims." App'x 139.

In a critical paragraph, the Superior Court stated:

We shall address the Commonwealth's contentions [that the alleged *Brady* violations did not concern "material" evidence] *seriatim*. Before doing so, however, we must resolve the question of whether the procedural irregularities of this case preclude us from considering all of the evidence in the certified record. We conclude that we cannot confine our analysis only to newly acquired evidence that was timely presented. Rather, the distinction that must be made is whether a particular *claim* is timely and whether that claim is supported by sufficient evidence of record, no matter

33

when that evidence was acquired. Because the PCRA's timing restrictions are jurisdictional, this Court lacks authority to affirm an order granting relief predicated on an untimely claim merely because certain timely presented after-discovered evidence tends to support that claim. Conversely, however, a timely asserted claim cannot be found to be invalid simply because part of the evidence that supports the PCRA court's ruling was submitted too late to form the basis of an entirely separate claim. In short, we cannot review the PCRA court's rulings on a diminished record.

App'x 148-49.

The Superior Court proceeded to reach the merits of *all* of the articles of evidence cited in the PCRA III petition, with the exception of the recorded statement referenced in the Goodwin Report—an issue that was "previously litigated" by the PCRA I court. The Superior Court reiterated its conclusion that it was required to consider the merits as to *all* of the individual articles of evidence, including those articles that would have been untimely if raised separately:

Nevertheless, the third PCRA court's grant of relief did not rely only on the eleven pieces of purported newly-discovered

34

evidence, which were untimely asserted. We must therefore discuss all of the evidence on which that court relied in granting relief. *See Santiago*, 654 A.2d at 1070 (holding that an appellate court must evaluate the significance of suppressed evidence pursuant to *Brady* in relation to the record as a whole). As noted above, there is a distinction to be made between a claim that is untimely under the PCRA and a timely claim predicated on evidence that has been presented too late to create a separate issue.

App'x 162-63.

The relationship between the court's discussion of the timeliness of Munchinski's claims and its discussion of the merits of Munchinski's claims is unclear. Nothing in the opinion suggests that the court's ruling on the merits was in the alternative. Indeed, the opinion suggests the opposite—that under Pennsylvania law, the court was *required* to consider *all* of the evidence listed in Munchinski's petition, even if some of that evidence would have been untimely in a separate petition. At all events, the Superior Court reversed the PCRA III court and dismissed the PCRA III petition. Munchinski sought review from the Pennsylvania Supreme Court, but on February 8, 2007, that court denied allocatur.

35

3.

On December 15, 2007, Munchinski filed the instant habeas petition in the United States District Court for the Western District of Pennsylvania. The District Court concluded that this petition was a "second or successive petition" within the meaning of 28 U.S.C. § 2244(b), and transferred jurisdiction over the case to this court pursuant to 28 U.S.C. § 1631. On November 5, 2009, we concluded that Munchinski presented "a *prima facie* showing that his petition contain[ed] newly discovered evidence" as required under § 2244(b), and transferred jurisdiction over the petition back to the District Court.

On August 5, 2011, the Magistrate Judge to whom this matter was assigned issued a thorough 80-page opinion granting Munchinski's habeas petition. Aware of the arguments over whether Munchinski had properly complied with state and federal procedural requirements, the District Court first considered whether Munchinski's petition was timely under the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996), which requires that claims based on newly-discovered evidence be filed within one year of the discovery of that evidence. The court found that the majority of the eleven articles of newly-discovered evidence, with the exception of the Veil/Mangello Report, the Madden/Lucy Report, and the Bates Report II, were raised beyond the one year statute of limitations

36

in § 2244(d)(1)(D).

Though untimely, the District Court equitably tolled the one-year statute of limitations for the majority of these articles of evidence, with the exception of the Sava Addendum, the Parole Revocation Documents, and the Goodwin Report, which were discovered prior to the filing of the PCRA I petition. The court reasoned that the uncertainty in the Pennsylvania State Courts surrounding parallel petitions for post-conviction relief in both state and federal courts was a sufficiently extraordinary circumstance to justify equitable tolling given "the general diligence exhibited by [Munchinski] throughout this ordeal[.]" Commonwealth App'x 40.

The court then considered whether Munchinski had procedurally defaulted his claims. The court appears to have assumed that there was procedural default. The bulk of the court's analysis focused on whether default could be excused. The court acknowledged that a procedural default can be excused for one of two reasons: (1) if a petitioner can show cause for the default and prejudice resulting therefrom; or (2) if enforcing the procedural default rule would effect a fundamental miscarriage of justice.

The court declined to consider whether Munchinski had shown cause and prejudice, because "he so clearly qualifies for the second exception to the procedural default rule—i.e., failing to allow his claims

37

to proceed would result in a fundamental miscarriage of justice." Commonwealth App'x 46. Specifically, the court concluded that a fundamental miscarriage of justice would occur because "he has show[n] by 'clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.'" Commonwealth App'x 46 (quoting 28 U.S.C. § 2244(b)(2)(B)(ii)).

Finally, the District Court reached the merits of Munchinski's *Brady* claims. The District Court concluded that the Superior Court unreasonably applied *Brady* in violation of 28 U.S.C. § 2254(d)(1), because the court analyzed the materiality of the withheld evidence individually, rather than collectively. *See Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995). The court further concluded that Munchinski's new evidence demonstrated that no reasonable juror would have found him guilty under the high standard required of a habeas petitioner filing a second or successive petition under 28 U.S.C. § 2244(b)(2). The District Court granted Munchinski habeas relief, permitting the Commonwealth 120 days from the filing of its order in which it could retry Munchinski. The District Court also ruled that it would stay its order if either party chose to appeal. On September 2, 2011, the Commonwealth timely appealed.

II.

The Commonwealth raises three arguments on

38

appeal: (1) that the District Court erred by equitably tolling AEDPA's one-year statute of limitations; (2) that Munchinski procedurally defaulted certain claims, and the District Court erred by excusing the default on the grounds of fundamental miscarriage of justice grounds; and (3) that Munchinski failed to demonstrate his actual innocence under the high standard required by § 2244(b)(2)(B)(ii). The District Court had jurisdiction over Munchinski's petition pursuant to 28 U.S.C. §§ 2241 & 2254. We have jurisdiction over this appeal pursuant to 28 U.S.C. §§ 1291 & 2253.

## A.

### 1.

Under AEDPA, "[a] 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d). For a petitioner asserting claims based on newly-discovered evidence, the limitations period generally will begin to run on "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." *Id.* § 2244(d)(1)(D). AEDPA provides that the one-year limitation period is subject to "statutory tolling": "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any

period of limitation under this subsection." *Id.* § 2244(d)(2).

AEDPA's statute of limitations must be applied "on a claim-by-claim basis." *Fielder v. Varner*, 379 F.3d 113, 118 (3d Cir. 2004). The District Court divided the alleged *Brady* violations into three separate groups based on "the date on which the factual predicate of the claim . . . presented could have been discovered through the exercise of due diligence." *Id.* § 2244(d)(1)(D).[13] For

---

[13] The District Court, citing *Fielder*, considered each article of evidence as giving rise to a separate *Brady* claim with an independent statute of limitations. Consequently, the District Court reasoned that certain *Brady* claims could be timely under § 2244(d), while other claims might well be untimely. We agree that this is the correct approach when considering a petition alleging multiple *Brady* violations. For most purposes, courts must analyze *Brady* allegations by evaluating "the undisclosed evidence item by item[.]" *Kyles*, 514 U.S. at 437 n.10. Only after that initial item-by-item analysis do we "evaluate its cumulative effect for purposes of materiality[.]" *Id.* Thus, while each alleged *Brady* violation bears on the materiality of other alleged violations, each violation constitutes a separate claim that must be analyzed independently in other respects. As such, we must independently consider whether *each* alleged *Brady* violation is timely under § 2244(d).

each group, the District Court properly applied a two-step analysis to determine whether the claims were timely under § 2244(d)(1). First, the court considered whether more than one year had elapsed between the date on which the relevant evidence could have been discovered through the exercise of due diligence. If more than one year had elapsed, the court then considered whether the group of claims was entitled to statutory tolling pursuant to § 2244(d)(2).

The Group 1 claims are based on the Veil/Mangello Report, the Madden/Lucy Report, and the Bates II Report. This evidence was discovered on March 10, 2003, while the PCRA III petition was pending.[14] The instant habeas petition was filed on December 15, 2007. More than one year lapsed from the date of discovery until the date Munchinski's habeas petition

---

Because the Commonwealth has conceded that the Superior Court unreasonably applied *Brady*, a point which appears to be beyond dispute, we do not consider whether, even if certain *Brady* violations were raised beyond § 2244's one-year statute of limitations, they can nonetheless be considered as part of the cumulative materiality analysis required by *Kyles*.

[14] The Commonwealth has not alleged that this evidence "could have been discovered" any earlier, within the meaning of § 2244(d)(1)(D).

41

was filed, rendering the Group 1 claims untimely under § 2244(d)(1).

On April 15, 2003, however, Munchinski filed his PCRA III petition in Pennsylvania state court. The Superior Court found that the *Brady* violations in Group 1 were properly filed. Thus, from April 15, 2003 until February 8, 2007, when the Pennsylvania Supreme Court denied Munchinski's request for allocatur, there was a properly filed PCRA petition pending in the state court system. As a result, Munchinski is entitled to statutory tolling for this period pursuant to § 2244(d)(2). This means that the statute of limitations for the Group 1 claims ran from March 10, 2003 until April 15, 2003, and then from February 8, 2007 until December 15, 2007. Cumulatively, these periods are shorter than one year. The Group 1 claims are therefore timely under § 2244.

The Group 2 claims are based on the Goodwin Report, the Sava Report, and the Parole Revocation Documents. This evidence was discovered prior to the filing of Munchinski's PCRA I petition. Given that we previously held these claims untimely in Munchinski's first habeas petition, *Munchinski v. Price*, 254 F.3d 1078 (3d Cir. 2001) (unpublished), the District Court concluded that these claims are also untimely in the instant petition. We agree, and conclude that the Group 2 claims are untimely under § 2244(d).

Finally, the Group 3 claims are based on: (1) the

42

Bates Report; (2) the Goodwin/Powell Report; (3) the Powell Addendum; (4) the Mangiacarne/Carbone Report; (5) the Dunkard/Proud Report; and (6) the Kinch Report. This evidence was discovered at an unspecified time in 2000, while Munchinski's appeal from the denial of his first federal habeas petition was pending before this court. The District Court concluded that the Bates Report was discovered on or before May 12, 2000, when Munchinski filed his *pro se* PCRA II petition referencing the Bates Report. Again, well over a year elapsed between the discovery of the report and the filing of the instant habeas petition; that particular claim is thus untimely under § 2244(d)(1). The court credited Munchinski's assertion that the remaining evidence in Group 3 was discovered between July 27, 2000 and August 24, 2000. Using the July 27, 2000 date as the date of discovery, the Group 3 claims are also untimely under § 2244(d)(1).

Nor are the Group 3 claims entitled to statutory tolling under § 2244(d)(2). The PCRA II court dismissed the PCRA II petition, first for being filed *pro se*, and second for lack of jurisdiction. As such, the petition was never "properly filed" within the meaning of § 2244(d)(2). *See Artuz v. Bennett*, 531 U.S. 4, 8 (2000). Similarly, the Superior Court reviewing Munchinski's PCRA III petition concluded that the *Brady* allegations premised on the evidence in Group 3 were not raised within 60 days of the date of discovery, as required by

Pennsylvania law.[15]  As such, the PCRA III petition was also not "properly filed" within the meaning of § 2244(d)(2).  Thus, the Group 3 claims are untimely under § 2244(d).

2.

Though the Group 2 and 3 claims are untimely under § 2244(d), the Supreme Court has held that § 2244(d) "is not 'jurisdictional'" and does not set forth "an inflexible rule requiring dismissal . . . [whenever the] clock has run."  *Day v. McDonough*, 547 U.S. 198, 205, 208 (2006).  Rather, "§ 2244(d) is subject to equitable tolling in appropriate cases."  *Holland v. Florida*, --- U.S. ---, 130 S. Ct. 2549, 2560 (2010).

The decision to equitably toll § 2244(d) "must be made on a case-by-case basis."  *Id.* at 2563 (quoting *Baggett v. Bullitt*, 377 U.S. 360, 375 (1964)).  "In each case, there is a need for 'flexibility,' 'avoiding mechanical rules,' and 'awareness . . . that specific circumstances, often hard to predict in advance, could warrant special treatment in an appropriate case."  *Pabon v. Mahanoy*, 654 F.3d 385, 399 (3d Cir. 2011) (quoting *Holland,* 130 S. Ct. at 2563).  There are "no bright lines in determining whether equitable tolling is warranted in a

---

[15] As we note in Part II.B, *infra*, the court nevertheless concluded for other reasons that it had to consider that evidence in its merits analysis.

given case." *Id.* Rather, equitable tolling is appropriate when "principles of equity would make the rigid application of a limitation period unfair." *Miller v. N.J. State Dep't of Corr.*, 145 F.3d 616, 618 (3d Cir. 1998) (alterations omitted).

Generally speaking, a petitioner is entitled to tolling if he shows: (1) "'that some extraordinary circumstance stood in his way' and prevented timely filing"; and (2) that "he has been pursuing his rights diligently." *Id.* at 2562 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).[16] Initially, we agree with the

---

[16] It is worth noting that "a growing chorus" of our sister circuits have recognized "an equitable exception to AEDPA's limitation period in extraordinary cases . . . in which the petitioner has made a credible and compelling showing of his actual innocence[.]" *Rivas v. Fischer*, --- F.3d ---, 2012 WL 2686117, at *32 (2d Cir. July 9 2012); *see also Perkins v. McQuiggin*, 670 F.3d 665, 675 (6th Cir. 2012) (holding that there is an "actual innocence" exception to § 2244(d)); *San Martin v. McNeil*, 633 F.3d 1257, 1267-68 (11th Cir. 2011) (same); *Lee v. Lampert*, 653 F.3d 929, 934 (9th Cir. 2011) (en banc) (same); *Lopez v. Trani*, 628 F.3d 1228, 1230-31 (10th Cir. 2010) (same). *But see Escamilla v. Jungwirth*, 426 F.3d 868, 871-72 (7th Cir. 2005) (holding that there is no "actual innocence" exception to § 2244(d)); *Cousin v. Lensing*, 310 F.3d 843, 849 (5th Cir. 2002) (same); *David v. Hall*,

45

District Court that the Group 2 claims are not eligible for equitable tolling. The parties do not object to this conclusion. The Commonwealth's argument focuses on the Group 3 claims. The District Court concluded that the Group 3 claims were eligible for equitable tolling because the PCRA II court's erroneous dismissal of the PCRA II petition constitutes an extraordinary circumstance, and because Munchinski diligently pursued his rights despite his circumstances.

(a)

The Commonwealth first challenges the District Court's conclusion that there were extraordinary circumstances that prevented Munchinski from timely filing the instant habeas petition. When the facts allegedly constituting an extraordinary circumstance are not in dispute, "a District Court's decision on the question whether a case is sufficiently 'extraordinary' to justify equitable tolling should be reviewed de novo."

---

318 F.3d 343, 347 (1st Cir. 2003) (same). Because we conclude that Munchinski has shown diligence and extraordinary circumstances, however, we agree with the District Court that he is entitled to equitable tolling on that basis. We thus do not consider whether an "actual innocence" exception to § 2244(d) exists.

*Brinson v. Vaughn*, 398 F.3d 225, 230 (3d Cir. 2005).[17]

The extraordinary circumstances prong requires that the petitioner "in some extraordinary way be[ ] prevented from asserting his or her rights." *Brown v. Shannon*, 322 F.3d 768, 773 (3d Cir. 2003). "One . . . potentially extraordinary situation is where a court has misled a party regarding the steps that the party needs to take to preserve a claim." *Brinson*, 398 F.3d at 230. That is precisely what happened here. The facts before us are remarkably similar to those in *Urcinoli v. Cathel*, 546 F.3d 269, 273 (3d Cir. 2008). In both cases, a court erroneously dismissed pending petitions amidst confusion over recent caselaw. In both cases, the court implicitly suggested steps that the petitioner should take to present the same claims in the future. In *Urcinoli*, the court dismissed a so-called "mixed" habeas petition containing both exhausted and unexhausted claims, and implicitly suggested that the petitioner refile the same petition without the allegedly unexhausted claims. As we noted, however, if the petitioner refiled the petition, those claims would have been untimely because the one-year limitation in § 2244(d) had already passed. *Id.* So too

---

[17] *Brinson* suggested that a *de novo* standard of review should apply, but declined to decide the issue. In *Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007), however, we applied a *de novo* standard, and implicitly adopted *Brinson*.

47

here, the PCRA II court erroneously dismissed the PCRA II petition for lack of jurisdiction because of Munchinski's pending federal appeal. In so doing, the court implied that Munchinski could reassert his claims once the federal appeal was resolved. Munchinski did precisely that, but the Superior Court concluded that such claims had become untimely.

We thus conclude, as we did in *Urcinoli*, that the PCRA II court's dismissal of Munchinski's pending petition, with its implicit suggestion that Munchinski refile once his federal appeal was resolved, was sufficiently misleading as to constitute an extraordinary circumstance because "it later operate[d] to prevent [Munchinski] from pursuing his rights." *Id.* at 275.

(b)

The diligence required of a habeas petitioner seeking equitable tolling "is reasonable diligence, not maximum feasible diligence." *Holland*, 130 S. Ct. at 2565 (internal quotation marks and citations omitted). The Commonwealth argues that by failing to appeal the PCRA II court's erroneous dismissal of his petition, Munchinski did not demonstrate the "reasonable diligence" necessary to permit equitable tolling.

We have not addressed the appropriate standard of review for a District Court's determination that a habeas petitioner demonstrated reasonable diligence. Whether a

48

petitioner's diligence was "reasonable" under the circumstances of the case seems a much more fact-intensive inquiry than whether a set of undisputed facts constitutes an "extraordinary circumstance" as a matter of law. As such, *Brinson*'s reasons for *de novo* review of a district court's extraordinary circumstances analysis may not apply to its diligence analysis in all cases. *See, e.g.*, *Rivas v. Fischer*, --- F.3d ---, 2012 WL 2686117, at *21 (2d Cir. July 9, 2012) (reviewing district court's diligence analysis for clear error). Indeed, when reviewing a district court's determination that a petitioner demonstrated "reasonable diligence in the circumstances" under § 2244(d)(1)(D), we apply a clear error standard. *Wilson v. Beard*, 426 F.3d 653, 660-61 (3d Cir. 2005). We need not decide this issue, however, because we conclude that Munchinski demonstrated reasonable diligence even under a *de novo* standard.

The diligence requirement "does not demand a showing that the petitioner left no stone unturned." *Ramos-Martinez v. United States*, 638 F.3d 315, 324 (1st Cir. 2011). Rather, "[t]o determine if a petitioner has been [reasonably] diligent in pursuing his petition, courts consider the petitioner's overall level of care and caution in light of his or her particular circumstances." *Doe v. Busby*, 661 F.3d 1001, 1013 (9th Cir. 2011); *see also Schlueter v. Varner*, 384 F.3d 69, 74 (3d Cir. 2004) ("Due diligence . . . require[s] reasonable diligence in the circumstances."). In other words, the diligence inquiry

49

is fact-specific and depends on the circumstances faced by the particular petitioner; there are no bright line rules as to what conduct is insufficient to constitute reasonable diligence. If a petitioner "did what he reasonably thought was necessary to preserve his rights . . . based on information he received . . . , then he can hardly be faulted for not acting more 'diligently' than he did." *Holmes v. Spencer*, 685 F.3d 51, 65 (1st Cir. 2012).

Over the past several decades, Munchinski has vigorously pursued relief in state and federal courts. He has filed five petitions for post-conviction relief, all raising substantial and difficult questions about his conviction. He filed the PCRA II petition very soon after discovering the Bates Report, though the petition was mistakenly dismissed by the court. He followed the PCRA II court's implicit suggestion and filed his PCRA III petition within a month of our dismissal of the Appeal, when the alleged jurisdictional issue had been resolved. Throughout this process, he continued to collect evidence. He presented this evidence in his PCRA III petition—if the PCRA II court had been correct about the jurisdictional issue, this evidence would have been timely presented under 42 Pa. Cons. Stat. Ann. § 9545(b)(2). Under the circumstances, we conclude that Munchinski was reasonably diligent.

Munchinski's conduct is comparable to that of the petitioner in *Mathis v. Thaler*, 616 F.3d 461 (5th Cir. 2010). In that case, the petitioner was simultaneously

pursuing post-conviction relief in state and federal courts. Just like the PCRA II court, the state court erroneously dismissed the pending state court petition based on its understanding of Texas's so-called "two-forum rule," which prohibited state courts from exercising jurisdiction over a state court petition while a federal petition was pending. The Texas state courts subsequently clarified the two-forum rule in *Ex parte Soffar*, 143 S.W. 3d 804, 807 (Tex. Crim. Ct. App. 2004), permitting review of a state court petition if the federal petition was stayed.

Soon after the *Soffar* decision, the petitioner again sought relief in the state courts. The Fifth Circuit concluded that the petitioner "exhibited a pattern of diligently pursuing his rights in state and federal court, despite procedural difficulties. . . . Far from sleeping on his rights, [the petitioner] sought relief in multiple tribunals in an effort to raise his . . . claim. Under the circumstances, [the petitioner's] actions were more than reasonably diligent." *Mathis*, 616 F.3d at 474. We reach the same conclusion here, and agree with the District Court that in view of the extraordinarily difficult circumstances that Munchinski faced, he demonstrated reasonable diligence in pursuing his rights.

The Commonwealth argues that Munchinski's failure to appeal from the PCRA II court's dismissal of his petition precludes him from showing reasonable diligence. We disagree. Although with the benefit of hindsight, an appeal may have been prudent, equitable

tolling does not require the "maximum feasible diligence." *Holland*, 130 S. Ct. at 2565. What the diligence inquiry requires is *reasonable* diligence under the circumstances of a particular case.

The PCRA II court interpreted Pennsylvania state law as precluding jurisdiction over a PCRA petition while Munchinski's federal appeal remained pending. As the District Court noted, at that time the Pennsylvania Supreme Court had yet to issue its ruling in *Commonwealth v. Whitney*, 817 A.2d 473 (Pa. 2003), which clarified that Pennsylvania state courts *do* maintain jurisdiction over a PCRA petition despite a pending federal petition. As such, when the PCRA II court dismissed Munchinski's petition, it was not clear that the court had erred. The Pennsylvania Supreme Court's case law could be read (as it was by the PCRA II court) to disclaim jurisdiction over a PCRA petition while a federal petition was pending. There then existed no case law that might clearly indicate to Munchinski that the PCRA II court had erred. Given the uncertainty surrounding the issue, we do not think it was unreasonable for Munchinski to choose to credit the PCRA II court's interpretation of Pennsylvania procedural law, and heed its implicit suggestion that he wait to refile his claims once this court resolved his federal appeal.

As we have observed, the diligence inquiry is contextual. Here, Munchinski made almost every effort

to seek timely post-conviction relief in both the state and federal systems. He simply chose to follow the implicit suggestion from the PCRA II court rather than appeal its decision. He did not "sleep[ ] on his rights." *Mathis*, 616 F.3d at 474. Nor did he simply misread a court opinion. *See Sistrunk v. Rozum*, 674 F.3d 181, 190 (3d Cir. 2012) (holding that "misreading a court opinion" was not a sufficient basis to permit equitable tolling). He did exactly what the PCRA II court implicitly suggested, doing "what he reasonably thought was necessary to preserve his rights . . . based on information he received[.]" *Holmes*, 685 F.3d at 65. Under these circumstances, the "principles of equity would make the rigid application of a limitation period unfair." *Miller*, 145 F.3d at 618 (alterations omitted). We thus conclude that Munchinski was reasonably diligent under the circumstances in pursuing his rights.

Because we conclude that Munchinski faced extraordinary circumstances and demonstrated reasonable diligence in pursuit of his rights, we agree with the District Court that he is entitled to equitable tolling. The District Court was correct in deciding to toll the statute of limitations as to his Group 3 claims from August 24, 2000, when Munchinski's PCRA II petition was dismissed,[18] until February 8, 2007, when the

---

[18] It is unclear why the District Court only tolled § 2244 starting on August 24, 2000, when his PCRA II petition

53

Pennsylvania Supreme Court denied allocatur over the Superior Court's dismissal of his PCRA III petition. With this period equitably tolled, Munchinski's Group 3 claims, with the exception of his claim based on the Bates Report, are timely. As such, the District Court could properly consider the Group 1 and Group 3 claims, again with the exception of the claim based on the Bates Report.

## B.

Even if a claim is timely under § 2244, a federal court "may not conduct habeas corpus review of a claim which a petitioner has procedurally defaulted in state court." *Lark v. Sec'y Pa. Dep't of Corr.*, 645 F.3d 596, 611 (3d Cir. 2011). Grounded in principles of comity and federalism, the procedural default doctrine prevents a federal court sitting in habeas from reviewing a state

---

was dismissed, as opposed to July 27, 2000, when the PCRA II petition was filed. Certainly, the alleged extraordinary circumstance here, the PCRA II court's erroneous dismissal of Munchinski's petition along with the suggestion that Munchinski wait to refile his petition once the Appeal was resolved, did not occur until August 24, 2000. But for this circumstance, the PCRA II petition may well have been "properly filed, and Munchinski may have been entitled to statutory tolling under § 2244(d)(2). Munchinski has not raised this argument on appeal, however, and it does not affect our judgment.

court decision that rests on a state law ground "that is sufficient to support the judgment," when that state law ground "is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). In such situations, "resolution of any independent federal ground for the decision could not affect the judgment and would therefore be advisory." *Id.*

As the Supreme Court noted in *Coleman*, "[i]t is not always easy for a federal court to apply the [procedural default] doctrine. State court opinions will, at times, discuss federal questions at length and mention a state law basis for decision only briefly." *Id.* at 732. A state court can still "look to federal law for guidance or as an alternative holding while still relying on an independent and adequate state ground" as long as it states "'clearly and expressly that [its decision] is . . . based on bona fide separate, adequate, and independent grounds.'" *Id.* at 733 (quoting *Michigan v. Long*, 463 U.S. 1032, 1041 (1983)). In certain situations, however, it may be "difficult to determine if the state law discussion is truly an independent basis for decision[,]" and thus whether there has been a procedural default. *Id.* at 732.

To account for this difficulty, the Supreme Court has instructed federal courts to "presume that there is no independent and adequate state ground for a court decision . . . when the adequacy and independence of any

possible state law ground is not clear from the face of the opinion. *Id.* at 735 (citation and internal quotation marks omitted). In order to overcome this presumption, "the last state court to which the petitioner presented his federal claims . . . [must] clearly and expressly rely on an independent and adequate state ground[.]" *Id.*

The District Court held that Munchinski procedurally defaulted his Group 3 claims. The court concluded that the Superior Court relied on an independent and adequate state law ground, namely the sixty-day statute of limitations in § 9545(b)(2), to dismiss the Group 3 claims. Only then did the court consider whether or not to excuse the procedural default, ultimately excusing the default on fundamental miscarriage of justice grounds. We do not reach the latter question because we disagree with the District Court as to the former; we conclude that the Superior Court did not "clearly and expressly" rely on a state law ground sufficient to support its judgment, and thus that there was no procedural default.

The Commonwealth argues that there was in fact a procedural default, and directs us to the portions of the opinion discussing the timeliness of the Group 3 claims. *See* Commonwealth App'x 117-23. Admittedly, there is language in the court's opinion suggesting that these claims, *considered in isolation*, are untimely under § 9545(b)(2). But the opinion immediately follows that discussion with the disclaimer that its "analysis does not

56

end here, however." *Id.* at 123.

The remainder of the Superior Court's opinion is difficult to understand, and at times seems almost self-contradictory. The Superior Court apparently concluded that the Group 3 claims were "submitted too late to form the basis of an entirely separate claim." *Id.* at 149. Nonetheless, "a timely asserted claim cannot be found to be invalid simply because part of the evidence that supports the PCRA court's ruling was submitted too late to form the basis of an entirely separate claim." *Id.* Consequently, the court concluded that it could not "review the PCRA court's rulings on a diminished record[,]" and reached the merits of *all* of Munchinski's *Brady* claims. *Id.*

In other words, the court concluded that even though the Group 2 and Group 3 claims were untimely if presented independently, it was required to consider the materiality of *all* of the alleged suppressed evidence because Munchinski did present timely *Brady* claims via Group 1. Though the Superior Court does not explain *why* it was required to reach the merits as to *all* of Munchinski's *Brady* claims, it cites a Pennsylvania Supreme Court case to support its conclusion. As such, this conclusion appears to result from an interpretation of state law, and is not properly before us. The only issue we must consider is whether the Superior Court's earlier statements regarding the Group 2 and 3 claims provide an independent and adequate state court ground sufficient to

57

support its judgment.

The Superior Court concluded that despite "the procedural irregularities of this case," it was required to address the federal question as to all of Munchinski's *Brady* claims. The court *could not* then have relied exclusively on its procedural rulings to resolve the Group 2 and Group 3 claims. Indeed, the court repeats several times, using mandatory language, that it was *required* to reach the merits of all of Munchinski's claims, stating: (1) that it "cannot confine [its] analysis only to newly acquired evidence that was timely presented," *Id.* at 148; (2) that "a timely asserted claim cannot be found to be invalid simply because part of the evidence that supports the PCRA court's ruling was submitted too late to form the basis of an entirely separate claim," *Id.* at 149; (3) that it "cannot review the PCRA court's ruling on a diminished record," *Id.*; and (4) that it "must therefore discuss all of the evidence on which that court relied on granting relief," *Id.* at 162.

Despite Munchinski's procedural error, the Superior Court concluded that it was required to consider the materiality of all of the evidence raised in the PCRA III petition. Logically speaking, the procedural ruling was not sufficient to support the court's judgment. That is, the court could not avoid analyzing the merits of Munchinski's Group 3 claims on the basis of their timeliness. Indeed, the court specifically rejected that possibility. *See id.* at 148 ("We conclude that we *cannot*

58

confine our analysis only to newly acquired evidence that was timely presented [under § 9545(b)(2)]." (emphasis added)).

This is not a case where addressing "any independent federal ground for the decision could not affect the judgment and would therefore be advisory." *Coleman*, 501 U.S. at 729. Munchinski's habeas petition was directed at the Superior Court's *Brady* analysis of the Group 1 and Group 3 claims—an analysis implicating federal law that the Superior Court apparently believed it was required to conduct. If we disagree with the Superior Court's application of federal law, and we do, the Superior Court's judgment cannot be sustained. *See Smith v. Freeman*, 892 F.2d 331, 336-37 (3d Cir. 1989) (holding that there was no procedural default even though a petition was possibly untimely, because the procedural error was not sufficient to support the state court's judgment; the state court determined that it was "bound under Pennsylvania law to reach the merits" despite any procedural error). As such, federalism and comity do not prevent us from considering the evidence giving rise to the Group 3 claims.

When pressed on this point at argument, the Commonwealth argued that the Court's discussion of the federal issues were simply alternative grounds for its judgment. To be sure, a state court can speak to a federal issue in the alternative, so long as it is clear from the face of the opinion that the state law ruling is sufficient to

59

support its judgment. *See Coleman*, 501 U.S. at 733. Here, however, the state law ruling was *not* sufficient to support its judgment—the court's *Brady* analysis was necessary to its holding. An issue that is necessary to the court's judgment cannot be "an alternative basis" for the ruling. Without the analysis of federal law, the Superior Court could not have reached the conclusion that it reached.

Even if it were possible to read the discussion of federal law as an alternative basis for the court's holding, we do not think that the opinion is sufficiently clear to overcome the presumption against procedural default. The Superior Court did not "clearly and expressly" rely on state procedural law as grounds for its judgment. As stated above, there is language in the opinion suggesting that Munchinski's procedural error was not a sufficient basis to support its judgment. The Superior Court did not indicate that its discussion of federal law was merely an alternative basis for its holding. Because "the adequacy and independence of any possible state law ground is not clear from the face of the opinion," *Coleman*, 501 U.S. at 735, we conclude that the District Court erred by concluding that Munchinski's Group 3 claims were procedurally defaulted. Absent any procedural default, the District Court did not err when it included the Group 3 claims in its merits analysis.

C.

Because the instant habeas petition is a second or successive petition, Munchinski must also demonstrate "by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii). Other courts have referred to this statute as requiring a "gateway" showing of actual innocence. *See, e.g.*, *United States v. MacDonald*, 641 F.3d 596, 611-12 (4th Cir. 2011).

1.

The Commonwealth argues that Munchinski has failed to prove by clear and convincing evidence that no reasonable juror could vote to convict him in light of his newly-discovered evidence. We generally review the District Court's "probability determination that no reasonable juror would convict *de novo*." *Gomez v. Jaimet*, 350 F.3d 673, 679 (7th Cir. 2003); *see also Sweger v. Chesney*, 294 F.3d 506, 522 (3d Cir. 2002).

At the Retrial, the Commonwealth built an elaborate theory of the case. It argued that the murders were drug related—that Munchinski, Scaglione, and Bowen drove to Gierke's cabin in a lime green Gran Torino in order to resolve a drug dispute. The Commonwealth presented a straightforward timeline of events, arguing that over the course of a few hours that night, Scaglione raped Gierke, Munchinski raped Alford, and then almost immediately afterwards, Gierke and

61

Alford were shot. The Commonwealth's theory was supported exclusively by Bowen's testimony. Indeed, the Commonwealth concedes as much in its briefing before this court. *See* Commonwealth Br. 41 ("Appellants acknowledge that Bowen's testimony was central to the prosecution case.").

We acknowledge that mere impeachment evidence is generally not sufficient to show actual innocence by clear and convincing evidence. *Cf. Sawyer v. Whitley*, 505 U.S. 333, 349 (1992). Munchinski's newly-discovered evidence, however, is not *mere* impeachment evidence. Rather, Munchinski's evidence clearly and convincingly shows that the murders *could not* have happened as the Commonwealth proposed at trial. *See Keith v. Bobby*, 551 F.3d 555, 558 (6th Cir. 2009) (differentiating between habeas petitions premised on mere impeachment evidence, and petitions based on "new evidence that . . . directly contradicted the government's case in chief"). The Powell Report and the Goodwin/Powell Report both suggest that the Commonwealth's timeline is inconsistent with the physical evidence from the autopsy.[19] The Bates Report

---

[19] The Commonwealth points to credibility issues concerning some of the new evidence that Munchinski raises in his habeas petition, arguing that Munchinski cannot surpass § 2244(b)(2)(B)(ii)'s high standard when his proffered evidence has credibility problems.

II suggests that Bowen, the only witness who could provide any details supporting the Commonwealth's theory of the case, was not even in Pennsylvania the night of the murders, and makes clear that the police were aware of this fact.

Besides Bowen's testimony, the only evidence linking Munchinski to the murders was (1) testimony from Lexa, Dahlmann, and Furr, three acquaintances who

Certainly, when analyzing the record for actual innocence purposes, "the court must give due regard to any unreliability of the evidence, and may have to make some credibility assessments[.]" *MacDonald*, 641 F.3d at 612-13 (citations and internal quotation marks omitted). There are minor credibility issues with some of Munchinski's evidence. For example, Powell claimed at the PCRA III hearings that he never stated that the rapes occurred at least 24 hours prior to the murders. The task of weighing the credibility of Munchinski's new evidence, however, would ultimately lie with the jury. The jury would have to determine whether to credit Powell's PCRA testimony, over two decades after the initial autopsy, or two statements made soon after the autopsies, and recorded by police officers with no motivation to misstate the facts. Our role is not to weigh the credibility of each witness; rather, we must consider *all* of the relevant evidence and account for any credibility issues in our analysis.

testified that Munchinski confessed to them in a bar in January 1978; and (2) testimony from Thomas, a jailhouse informant who claimed that Munchinski confessed to him in jail. The Mangiacarne/Carbone Report provided the jury evidence that Dahlmann, Lexa, and Furr had a motivation to fabricate Munchinski's supposed confession, to keep Dahlmann's ex-husband Wiltrout from being implicated in the crime. While Munchinski was aware that Wiltrout was a suspect in the murders early in the investigation, he could not effectively cross-examine Dahlmann, Lexa, and Furr about Wiltrout absent any evidence that Wiltrout was a serious subject of the investigation. The Mangiacarne/Carbone Report would have made clear to the jury that if the murders were not attributed to Munchinski, Wiltrout would be high on the list of potential suspects.

Again, the Mangiacarne/Carbone Report does more than just impeach Dahlmann, Lexa, and Furr. The report presents an alternative theory that better fits the verifiable facts of the case than the Commonwealth's theory. Carbone's account suggested that Wiltrout and at least one acquaintance travelled to Bear Rocks for a drug deal. At some point, the drug deal went bad and Wiltrout shot Alford and Gierke. Commonwealth App'x 220. There was no inconsistency between this account and Powell's statements concerning the timing of the rapes. The fact that Carbone's account supported a theory of the

64

case that better fit with other recovered evidence is a critical point. In *House v. Bell*, 547 U.S. 518 (2006), the Supreme Court found that the petitioner made a gateway showing of actual innocence in part because the petitioner's newly-discovered evidence identified an alternate suspect and supported a more appropriate theory of the case. *See id.* at 548-53.

The Commonwealth would essentially be asking the jury to convict based on: (1) an implausible theory of the case inconsistent with other evidence in the record; (2) self-serving testimony from three acquaintances whose testimony kept Dahlmann's ex-husband from becoming a target in the investigation; and (3) testimony from a jailhouse informant. Critically, the jury would be left without a theory of the case to explain the actual murder itself—testimony from Dahlmann, Lexa, Furr, and Thomas was limited to what happened after the murders, and did not provide the jury with a detailed account of what actually transpired in Bear Rocks.

On the other hand, Munchinski would have offered the jury alternative theories of the case without the problematic inconsistencies in Bowen's account. Considering all of the evidence that would have been presented to the jury, Munchinski has clearly and convincingly demonstrated that but for the Commonwealth's *Brady* violations, no reasonable juror could rationally believe beyond a reasonable doubt that Munchinski committed the Bear Rocks Murders.

65

The Commonwealth's case against Munchinski was always close, even without the critical pieces of evidence that the Commonwealth unlawfully suppressed. When the jury at the First Trial was presented with virtually the same evidence, they could not reach a verdict. Giving "due regard to any unreliability of" Munchinski's new evidence, we are satisfied that Munchinski has made a truly persuasive demonstration of his "actual innocence." *Schlup v. Delo*, 513 U.S. 298, 328 (1995). When all of the evidence is considered as a whole, we are convinced that no reasonable juror could rationally vote to convict. We thus conclude that Munchinski has made a gateway showing of actual innocence, under the clear and convincing evidence standard required under § 2244(b)(2)(B)(ii).

2.

The Commonwealth also argues that Munchinski has not "support[ed] his allegations of constitutional error with new reliable evidence." *Schlup*, 513 U.S. at 324. The Commonwealth concedes that Munchinski has presented "new" evidence, but argues that Munchinski's evidence is not "reliable" within the meaning of *Schlup*. Commonwealth Br. at 36 ("Although Munchinski presented new evidence, nothing about this evidence indicates that it is particularly reliable."). We review *de novo* whether a petitioner's evidence is sufficient to

satisfy *Schlup*. *See McCoy v. Norris*, 125 F.3d 1186, 1190 (8th Cir. 1997); *see also Sweger*, 294 F.3d at 522.[20]

In *Schlup*, the Supreme Court emphasized that a petitioner asserting actual innocence in a second or successive habeas petition based on newly-discovered

---

[20] We have not had occasion in this circuit to definitively determine whether § 2244(b)(2)(B)(ii) incorporates all of the "features of the standards spelled out in [ ] pre-AEDPA decisions . . . [that] oblige[ ] the prisoner to proffer some new evidence in support of his habeas corpus claim." *MacDonald*, 641 F.3d at 612. We have previously held that AEDPA "built on," rather than supplanted, the "abuse-of-the-writ" doctrine that preceded AEDPA. *See Goldblum v. Klem*, 510 F.3d 204, 216 & n.8 (3d Cir. 2007). Though *Goldblum* does not explicitly resolve the question at issue here—whether § 2244(b)(2)(B)(ii) incorporates *Schlup*'s requirement of new and reliable evidence—it does suggest that AEDPA did nothing to displace that requirement from *Schlup*. Consequently, we are inclined to agree with the Fourth Circuit that § 2244(b)(2)(B)(ii) incorporates *Schlup*, and that a petitioner filing a second or successive petition must provide new and reliable evidence in support of his or her claims. *See MacDonald*, 641 F.3d at 612. Because this issue has not been briefed by the parties, however, we will not address it here.

evidence must rely on "reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence[.]" *Schlup*, 513 U.S. at 324. The Commonwealth argues that because all of Munchinski's evidence merely attacks Bowen's credibility, his evidence does not fit within the categories of permissible evidence cited in *Schlup*, and thus cannot be "reliable."

*Schlup*'s three categories are not an exhaustive list of the types of evidence that can be "reliable." Indeed, the Supreme Court's own decision in *House*, 547 U.S. at 548-53, suggests that other types of evidence can pass the high bar set by *Schlup*. In *House*, the Supreme Court spent a large portion of its analysis on evidence that implicated another suspect. *Id.* This evidence is very similar to the evidence raised by Munchinski—the petitioner's evidence implicates other suspects and casts serious doubts on the viability of the Commonwealth's theory of the case. Moreover, Munchinski has presented evidence that is reliable under *Schlup*. The Powell Report and the Goodwin/Powell Report are "exculpatory scientific evidence" because both suggest that Alford had been raped "at least 24 hours prior" to his death.

When pressed about these two articles of evidence at oral argument, the Commonwealth argued that even though they might appear to be reliable, they are in fact not reliable because they conflicted with Powell's testimony during the PCRA proceedings. The

Commonwealth argued that because Powell later disavowed the claims in the Powell Report and the Goodwin/Powell Report, that those reports cannot be reliable. *Schlup*, however, does not require a habeas court to play the role of the jury and weigh all potentially countervailing evidence when considering whether a particular article of evidence is reliable. That weighing exercise is undertaken when the court considers whether any reasonable juror would vote to convict based on all of the evidence in the record. We conclude that the Goodwin/Powell Report and the Powell Report are "reliable," within the meaning of *Schlup*.

Similarly, the Bates Report II and the Dunkard/Proud Report are "reliable" evidence within the meaning of *Schlup*. The former is a police report relating an interview of someone with direct personal knowledge of Bowen's whereabouts. The latter is a police report relating an interview with a police dispatcher. Although neither is a sworn affidavit, both reports document what were, at the time, non-controversial facts that were recorded by the police themselves. We believe that the particular context surrounding these reports sufficiently guarantee their reliability in this case. Nothing in the record suggests that either the police or the declarants had any reason to misstate the facts in either of these reports at the time the reports were created.

The Commonwealth is correct that mere impeachment evidence is generally not sufficient to

satisfy the *Schlup* standard. *See Sawyer*, 505 U.S. at 349. But like the Powell Report and the Goodwin/Powell Report, both the Bates Report II and the Dunkard/Proud Report are not merely impeachment evidence. As such, they call into question the Commonwealth's entire theory of the case. Indeed, the prosecution appears to have recognized this, by highlighting the portion of the Bates Report II suggesting that Bowen had left for Oklahoma prior to the murders. Munchinski provides the type of evidence required of a second or successive petition under § 2244(b)(2)(B)(ii).

Based on all of this evidence, we conclude that Munchinski has "present[ed] new, reliable evidence that was not presented at trial." *Houck v. Stickman*, 625 F.3d 88, 93 (3d Cir. 2010) (citation omitted). Assuming that § 2244(b)(2)(B)(ii) incorporates *Schlup*'s requirement that a petitioner support his or her constitutional claims with new and reliable evidence, we are thus satisfied that Munchinski has presented evidence that satisfied *Schlup*'s high standard.

III.

The Commonwealth restricted its appeal to three issues: (1) whether the District Court erred by equitably tolling the statute of limitations for Munchinski's Group 3 claims; (2) whether the District Court erred by excusing the procedural default of his Group 3 claims; and (3) whether Munchinski has made a gateway showing of

actual innocence under § 2244(b)(2)(B)(ii). We will affirm the judgment of the District Court, although we depart from its reasoning. *See Ross v. Dist. Att'y of the Cnty. of Allegheny*, 672 F.3d 198, 213 n.12 (3d Cir. 2012) (noting that we can affirm on an alternative basis).

First, we agree with the District Court that Munchinski was entitled to equitable tolling for his Group 3 claims. Second, we conclude that Munchinski did not procedurally default his claims, and thus that there was no need to decide whether to excuse his alleged default. Finally, we conclude that Munchinski has shown, by clear and convincing evidence, that no reasonable juror would vote to convict him based on all of the evidence that should have been introduced at trial, absent the Commonwealth's constitutional violations. We also conclude that Munchinski has introduced new and reliable evidence in support of the constitutional claims in his second or successive petition. We acknowledge that both the Supreme Court and Congress have set a high standard for second or successive habeas petitions that "permits review only in the 'extraordinary' case." *House*, 547 U.S. at 538 (internal quotation marks omitted) (quoting *Schlup*, 513 U.S. at 327). "Extraordinary" is how Judge Feudale characterized this case when it was before him at the PCRA III stage, and "extraordinary" is how we view it for second or successive habeas purposes.

Though our reasoning differs from that of the

71

District Court, we ultimately agree with that court that the procedural irregularities of this case do not preclude us from reaching the merits of Munchinski's argument that the Superior Court unreasonably applied *Brady* as to his Group 1 and Group 3 claims—an argument that has been expressly and rightly conceded by the Commonwealth. It seems that the Commonwealth's decision to appeal the District Court's judgment may have been motivated by considerations external to this particular case, because it is difficult to discern any significant justification on this record for continuing to defend what is now acknowledged by all to be a badly tainted and highly suspect conviction. We will affirm the judgment of the District Court granting Munchinski a writ of habeas corpus pursuant to § 2254(d)(1). The Commonwealth must either release Munchinski or retry him within 120 days of our opinion.