**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 13-4181

_____

FRED BURTON,
                              Appellant

v.

MARTIN HORN, COMMISSIONER, PENNSYLVANIA DEPARTMENT OF
CORRECTIONS;  SUPERINTENDENT SOMERSET STATE CORRECTION
INSTITUTION;  THE DISTRICT ATTORNEY OF THE COUNTY OF
PHILADELPHIA;  THE ATTORNEY GENERAL OF THE STATE OF
PENNSYLVANIA

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Civ. No. 2-09-cv-02435)
District Judge: Honorable Norma L. Shapiro

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
May 18, 2015

Before: FUENTES, GREENAWAY, JR., and SLOVITER, *Circuit Judges*

(Filed: June 9, 2015)

_____

OPINION*

_____

---

*This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

FUENTES, *Circuit Judge*:

This case arises from the ambush of Philadelphia police officers in Fairmount Park in August of 1970. Fred Burton was convicted of murder and sentenced to life in prison for his role as a conspirator in the crime. He now petitions the court for a writ of habeas corpus based on purported *Brady* violations at the time of his trial. Burton concedes that, under the most favorable calculable deadline, his petition is untimely. He contends that he should nevertheless be permitted to advance his claims because he can show his actual innocence within the meaning of *McQuiggin v. Perkins*, 133 S. Ct. 1924 (2013), and because he was unable to file his petition sooner notwithstanding diligent pursuit of his claims, warranting tolling. We do not agree, and we will deny the petition.

**I.**

28 U.S.C. § 2244(d)(1) provides that a state prisoner must generally file his or her habeas petition within one year of the later of final judgment or April 23, 1997.[1] One exception to this is when the prisoner was prevented from filing a petition by unconstitutional state action; then the prisoner has one year from the date the impediment is removed. Another exception is when the factual predicate of the claim could not have been discovered through the exercise of due diligence; then the prisoner has one year from the

---

[1] *See Burns v. Morton*, 134 F.3d 109, 111 (3d Cir. 1998). Burton's petition is also successive, but the successive petition restrictions of § 2244 do not apply to him because his previous petitions were submitted prior to the enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See In re Minarik*, 166 F.3d 591, 609 (3d Cir. 1999). Though the pre-AEDPA restrictions on successive filing do apply to him, those restrictions are not at issue in this appeal.

date the factual predicate could have been discovered. The § 2244(d) limitations period "is subject to equitable tolling in appropriate cases."[2] Additionally, § 2244(d)'s timeliness requirements do not bar a claim where a petitioner makes a "convincing actual-innocence claim" within the meaning of *Schlup v. Delo,* 513 U.S. 298 (1995).[3]

Burton was tried for and convicted of murder in December 1972 and thereafter sentenced to life in prison.[4] His sentence became final in 1975 when the Pennsylvania Supreme Court affirmed his conviction on direct appeal.[5] Burton filed this counseled petition for habeas corpus in 2009, more than two decades after his sentence became final, and more than one decade after the expiration of the grace period for pre-AEDPA convictions. According to Burton, his one year limitations period began to run on August 22, 2005, because this was the date on which the government allegedly removed an impediment to his filing.[6] On this view, Burton would ordinarily have until August 22, 2006 to file his petition. Even under Burton's own argument, then, his petition is untimely unless he can demonstrate the applicability of tolling or an exception. The District Court

---

[2] *Holland v. Florida*, 560 U.S. 631, 645 (2010).

[3] *McQuiggin*, 133 S. Ct. at 1935.

[4] Burton was later involved in another locally notorious homicide: the double homicide of the warden and deputy warden at Holmesburg Prison, where Burton was incarcerated. Burton was convicted of one count of second degree murder and sentenced to life in prison. *See Commonwealth v. Burton*, 417 A.2d 611 (Pa. 1980).

[5] *See Commonwealth v. Burton*, 330 A.2d 833 (Pa. 1974).

[6] The District Court concluded that Burton's one year limitations period began to run in August 2003—more than one year before he filed for post-conviction relief in the

3

determined neither tolling nor an exception applies and denied Burton's petition as time-barred.[7]

## II.

On appeal, Burton first argues that he has made a convincing demonstration of his actual innocence such that the § 2244(d) time-bar should not apply. This "miscarriage of justice exception . . . applies to a severely confined category: cases in which new evidence shows it is more likely than not that no reasonable juror would have convicted the petitioner."[8]

Contending he can make the required showing, Burton points to various pieces of evidence that tend to undermine the credibility of the lead witness against him, Marie Williams. Marie Williams was the wife of Hugh Williams, a co-conspirator arrested at the scene of the Fairmount Park ambush. According to Marie Williams's trial testimony, Burton met in her basement with her husband and other confirmed assailants discussing the subject of "killing pigs" and blowing up a police station near the park. At trial, it was known and brought forth that Marie Williams had previously, in a preliminary hearing, denied any awareness of Burton's participation in conspiratorial conversations in her basement. Marie Williams's trial testimony explained that this discordant preliminary hearing testimony was

---

Pennsylvania courts.

[7] Because the facts are not in dispute, we exercise de novo review over the District Court's determination that Burton's petition is untimely. *See Munchinski v. Wilson*, 694 F.3d 308, 329 (3d Cir. 2012).

[8] *McQuiggin*, 133 S. Ct. at 1933 (quoting *Schlup*, 513 U.S. at 329) (internal quotation

a lie in order to protect her husband, who had not yet been tried or sentenced for his role in the conspiracy. Marie Williams's trial testimony was supported by the purported fact that, on the night of the murder, she gave a statement to police that incriminated her husband and several other black power militants, including Burton.

Burton now produces a letter allegedly from Marie Williams to law enforcement officials written weeks after the ambush. Commenting on her post-ambush statements to police, the letter states that "The statements that they forced me to give about my husband, Fred Burton and the others are all untrue and I will not repeat those lies again. So far as I know my husband nor any of the others I know had anything to do with the crimes they have been charged with." App. at 585. Burton also produces both the typed transcript and handwritten detective notes from Marie Williams's interviews with police on the night of and night after the ambush. These show that, in Marie Williams's first interview with police, she said there were six conspirators but named only five—none Burton. Burton next produces the transcript of the preliminary hearing at which Marie Williams denied knowledge of Burton's participation in any conspiracy to murder, which was not actually read into the record at Burton's trial. That transcript shows that Marie Williams was informed at that preliminary hearing that nothing she testified to could be used against her husband, notwithstanding her later trial testimony that she lied at the preliminary hearing to protect her husband. Burton finally produces the transcript of Marie Williams's immunity hearing, which he contends—along with other so-called coercion evidence—contain facts

marks omitted).

5

suggesting a coercive environment in the police station where she gave her initial statements.[9]

According to Burton, no reasonable juror aware of this unpresented information would have believed Marie Williams's trial testimony that she overheard Burton planning the conspiracy in her basement. With the new information, he says, jurors would have known that her initial statements to police were coerced and that one failed to mention Burton anyway, and that she had twice outright exonerated Burton rather than once. Meanwhile, he says her trial testimony explaining that she lied in the preliminary hearing to protect her husband would have carried no water, given that she did not, in fact, have to fear incriminating her husband. The contention is that any reasonable juror would have believed that Williams was telling the truth in her exoneration letter and at the preliminary hearing, and that she was lying at trial. And given the centrality of Marie Williams's incriminatory trial testimony to the Commonwealth's case, no reasonable juror would have voted to convict.

We agree with Burton that no juror who disbelieved Marie Williams's testimony could have voted to convict. We do not agree, however, that the evidence produced by Burton is such that it is more likely than not that no reasonable juror would have believed her testimony. Burton presents nothing that contradicts Marie Williams's testimony, i.e., nothing that tends to show that Burton was not, in fact, a participant in planning meetings

---

[9] The respondents do not concede that the letter allegedly written by Marie Williams is authentic.

with Hugh Williams and other conspirators in the Williams' basement.[10] Rather, Burton's evidence is impeachment evidence that calls into question Marie Williams's credibility but does not undermine the content of her testimony. As we have held, "mere impeachment evidence is generally not sufficient to satisfy the *Schlup* standard."[11]

Yet more, Burton's assault on Marie Williams's credibility is incomplete. The jury knew that she had changed her story, and to this effect, additional information about when and how that story changed would, as the District Court found, have been cumulative. Moreover, Burton suggests no reason why Marie Williams had a motive to give false testimony against him at trial. To the contrary, Marie Williams's trial testimony was the only official statement she gave after her husband had already been tried and sentenced.[12] Of all the statements she gave, then, Marie Williams's trial testimony would appear to be the one in which she had the least incentive to lie. A reasonable juror could therefore

---

[10] The character evidence pointed to by Burton is not probative in this regard.

[11] *Munchinski*, 694 F.3d at 338. Burton's argument to the contrary relies on our decision in *Lambert v. Beard*, where we stated that "confidence in the outcome is particularly doubtful when the withheld evidence impeaches a witness whose testimony is uncorroborated and essential to the conviction." *See Lambert v. Beard*, 633 F.3d 126, 134 n.3 (3d Cir. 2011) (quoting *Norton v. Spencer*, 351 F.3d 1, 9 (1st Cir. 2003)). *Lambert*, however, was not an actual innocence case and did not involve application of the *Schlup* test. Furthermore, our judgment in *Lambert* was vacated by the Supreme Court. *See Wetzel v. Lambert*, 132 S. Ct. 1195 (2012).

[12] Hugh Williams was tried and convicted in February 1972. In 1974, the Pennsylvania Supreme Court vacated Hugh Williams's conviction on the finding that his written confession was not properly admissible at trial. *See Commonwealth v. Williams*, 319 A.2d 419 (Pa. 1974). Hugh Williams was retried in July 1974, convicted, and again sentenced to life in prison. *See Commonwealth v. Williams*, 382 A.2d 1202, 1203 (Pa. 1978).

7

conclude that, of the twists and turns in Marie Williams's story, the most reliable version of events was the incriminating one she offered against Burton at trial.

Burton has not made a convincing demonstration of his actual innocence. As such, he is not eligible for the actual innocence exception to the § 2244(d) time-bar.

**III.**

Burton's second argument is that the applicable filing deadline—which he contends should be August 22, 2006—should be equitably tolled because of his presentation of the arguments contained in his habeas petition to the Pennsylvania state courts, a necessary precursor to federal relief.[13] Burton's state court petition was filed pro se on September 24, 2004 and amended on September 28, 2005 by counsel to include, inter alia, the instant claims. The state court petition was denied as untimely by the Pennsylvania court on October 16, 2006; the denial was affirmed by the Pennsylvania Superior Court on October 24, 2007; and the Pennsylvania Supreme Court denied Burton's petition for allowance of appeal on October 8, 2008. The instant habeas petition was filed seven and a half months later, on May 28, 2009. According to Burton, his diligent pursuit of his claim between August 2005 and his federal filing should render his federal filing timely.

---

[13] *See* 28 U.S.C. § 2254(b)(1)(A). Burton does not argue that he is eligible for tolling under § 2244(d)(2), which provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." Indeed, Burton's state court petition was dismissed as untimely, and "an untimely [state] petition does not toll the statute of limitations for a federal habeas corpus petition." *Merritt v. Blaine*, 326 F.3d 157, 165 (3d Cir. 2003); *see also Pace v. DiGuglielmo*, 544 U.S. 408,

8

Burton contends that his claim should accrue on August 22, 2005 because this is the date on which he actually obtained a copy of the transcript of the preliminary hearing at which Marie Williams testified. There is a problem, however, with using this date as the start of Burton's limitations period: Burton has been aware of the preliminary hearing and Marie Williams's testimony at it since 1970, and there is no reason to think that Burton could not have obtained a copy of that transcript—with due diligence—well prior to 2005. The District Court consequently found that Burton's limitations period did not begin on August 22, 2005, but rather no later than August 2003, when he possessed all other material supporting his claim.

We agree with the District Court that Burton's one year limitations period began no later than August 2003. Burton does not dispute that he possessed all relevant material other than the preliminary hearing transcript by August 2003. Nor does Burton explain how he was thereafter impeded by the respondents or the state courts from obtaining a copy of the preliminary hearing transcript,[14] or prevented from discovering its contents despite the exercise of due diligence.[15]

Under § 2244(d), the latest plausible deadline for Burton to file his federal habeas petition was one year later, in August 2004. Burton did not file his state petition, however, until September 2004. Burton's federal claims were thus untimely by the time his state

---

417 (2005) ("Because the state court rejected petitioner's PCRA petition as untimely, it was not "properly filed," and he is not entitled to statutory tolling under § 2244(d)(2).").

[14] *See* § 2244(d)(1)(B).

petition was filed. We therefore we do not reach Burton's argument that the applicable limitations period should be tolled for the period in which his state petition was pending.

The judgment of the District Court will be affirmed.[16]

---

[15] *See* § 2244(d)(1)(D).

[16] Burton additionally raises a cursory argument that the Commonwealth should be equitably estopped from asserting AEDPA's time-bar because of its "thirty-one years of fraudulent concealment of exculpatory evidence." Appellant's Br. 47. Burton does not, however, say how his alleged inability to access the alleged *Brady* information is attributable to fraud. Thus, even assuming (without deciding) that the § 2244(d) time-bar is subject to equitable estoppel, we lack a basis to conclude that the Commonwealth should be estopped from asserting that his claim is time-barred.